ASKEW, GOVERNOR OF FLORIDA, ET AL. *v.*
AMERICAN WATERWAYS OPERATORS,
INC., ET AL.

No. 71–1082.   Argued November 14, 1972—Decided April 18, 1973

DOUGLAS, J., delivered the opinion for a unanimous Court.

*Robert L. Shevin,* Attorney General of Florida, and *Daniel S. Dearing* argued the cause and filed briefs for appellants.

*LeRoy Collins* and *Nicholas J. Healy* argued the cause for appellees.   With *Mr. Collins* on the brief for appellees American Waterways Operators, Inc., et al. were *Joseph C. Jacobs, John B. Chandler, Jr.,* and *Stewart D. Allen.* With *Mr. Healy* on the brief for appellees American Institute of Merchant Shipping et al. were *Gordon W.*

Paulsen, *Dewey R. Villareal, Jr.,* and *Emil A. Kratovil, Jr. James F. Moseley* filed a brief for appellees Suwannee Steamship Co. et al.*

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Jay L. Shavelson,* Assistant Attorney General, and *Carl Boronkay* and *Jeffrey C. Freedman,* Deputy Attorneys General, for the State of California; by *Arthur K. Bolton,* Attorney General, *Harold N. Hill, Jr.,* Executive Assistant Attorney General, and *Alfred L. Evans, Jr., James B. Talley,* and *Courtney Wilder Stanton,* Assistant Attorneys General, for the State of Georgia; by *George Pai,* Attorney General, and *Nobuki Kamida* and *Alan M. Goda,* Deputy Attorneys General, for the State of Hawaii; by *Francis B. Burch,* Attorney General, *Henry R. Lord,* Deputy Attorney General, and *Warren K. Rich,* Assistant Attorney General, for the State of Maryland; by *Robert H. Quinn,* Attorney General, and *Walter H. Mayo III* and *Roger Tippy,* Assistant Attorneys General, for the Commonwealth of Massachusetts; by *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Hugh B. Anderson* and *Charles S. Alpert,* Assistant Attorneys General, for the State of Michigan; by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Philip Weinberg* and *James P. Corcoran,* Assistant Attorneys General, for the State of New York, joined by *Robert K. Killian,* Attorney General of Connecticut, and *W. Laird Stabler, Jr.,* Attorney General of Delaware; by *Robert Morgan,* Attorney General, and *Christine Y. Denson,* Assistant Attorney General, for the State of North Carolina; by *Crawford C. Martin,* Attorney General, *Nola White,* First Assistant Attorney General, *Alfred Walker,* Executive Assistant Attorney General, and *Houghton Brownlee, Jr.,* and *John Milton Richardson,* Assistant Attorneys General, for the State of Texas; by *Andrew P. Miller,* Attorney General, and *C. Tabor Cronk,* Assistant Attorney General, for the Commonwealth of Virginia; and by *Slade Gorton,* Attorney General, *Charles B. Roe, Jr.,* Senior Assistant Attorney General, and *Charles W. Lean,* Assistant Attorney General, for the State of Washington.

Briefs of *amici curiae* urging affirmance were filed by *Robert G. McCreary, James J. Higgins, Warren A. Jackman, Sam L. Levinson, David R. Owen, John C. Shepherd,* and *Benjamin W. Yancey* for

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This action was brought by merchant shipowners and operators, world shipping associations, members of the Florida coastal barge and towing industry, and owners and operators of oil terminal facilities and heavy industries located in Florida, to enjoin application of the Florida Oil Spill Prevention and Pollution Control Act, Fla. Laws 1970, c. 70–244, Fla. Stat. Ann. § 376.011 *et seq.* (Supp. 1973) (hereinafter referred to as the Florida Act). Officials responsible for enforcing the Florida Act were named as defendants, but the State of Florida intervened as a party defendant, asserting that its interests were much broader than those of the named defendants. A three-judge court was convened pursuant to 28 U. S. C. § 2281.

The Florida Act imposes strict liability for any damage incurred by the State or private persons as a result of an oil spill in the State's territorial waters from any waterfront facility used for drilling for oil or handling the transfer or storage of oil (terminal facility) and from any ship destined for or leaving such facility. Each owner or operator of a terminal facility or ship subject to the Act must establish evidence of financial responsibility by insurance or a surety bond.[1] In addition, the Florida Act provides for regulation by the State Department of Natural Resources with respect to con-

---

the American Bar Association, and by *John M. McHose* for the Maritime Law Association of the United States.

*Solicitor General Griswold* and *Assistant Attorneys General Frizzell* and *Wood* filed a brief for the United States as *amicus curiae.*

[1] At the hearing on plaintiffs-appellees' application for a temporary restraining order, it was indicated that none of the plaintiffs had attempted to comply with the Florida Act. Shipowners and operators had threatened to divert their vessels from Florida ports.

tainment gear and other equipment which must be maintained by ships and terminal facilities for the prevention of oil spills.

Several months prior to the enactment of the Florida Act, Congress enacted the Water Quality Improvement Act of 1970, 84 Stat. 91, 33 U. S. C. § 1161 *et seq.* (hereinafter referred to as the Federal Act).[1a] This Act subjects shipowners and terminal facilities to liability without fault up to $14,000,000 and $8,000,000, respectively, for cleanup costs incurred by the Federal Government as a result of oil spills. It also authorizes the President to promulgate regulations requiring ships and terminal facilities to maintain equipment for the prevention of oil spills. It is around that Act and the federally protected tenets of maritime law evidenced by *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, and its progeny that the controversy turns. The District Court held that the Florida Act is an unconstitutional intrusion into the federal maritime domain. It declared the Florida Act null and void and enjoined its enforcement. 335 F. Supp. 1241.

The case is here on direct appeal. We reverse. We find no constitutional or statutory impediment to permitting Florida, in the present setting of this case, to establish any "requirement or liability" concerning the impact of oil spillages on Florida's interests or concerns. To rule as the District Court has done is to allow federal admiralty jurisdiction to swallow most of the police power of the States over oil spillage—an insidious form of pollution of vast concern to every coastal city or port

---

[1a] The Water Quality Improvement Act of 1970 was amended after this case was docketed by the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U. S. C. §§ 1251–1376. Since the sections of the 1970 Act cited in the opinion have not been substantially changed, references to the 1970 Act have been retained.

and to all the estuaries on which the life of the ocean and the lives of the coastal people are greatly dependent.

## I

It is clear at the outset that the Federal Act does not preclude, but in fact allows, state regulation. Section 1161 (*o*) provides that:

"(1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency *under any provision of law for damages to any publicly-owned or privately-owned property* resulting from a discharge of any oil or from the removal of any such oil.

"(2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing *any requirement or liability* with respect to the discharge of oil into any waters within such State.

"(3) Nothing in this section shall be construed . . . to affect any State or local law not in conflict with this section." (Emphasis added.)

According to the Conference Report, "any State would be free to provide requirements and penalties similar to those imposed by this section or *additional requirements and penalties*. These, however, would be separate and independent from those imposed by this section and would be enforced by the States through its courts." [2] (Emphasis added.) The Florida Act covers a wide range of "pollutants," § 3 (7), and a restricted definition of pollution. § 3 (8). We have here, however, no question concerning any pollutant except oil.

---

[2] H. R. Conf. Rep. No. 91–940, p. 42.

The Federal Act, to be sure, contains a pervasive system of federal control over discharges of oil "into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone." § 1161 (b)(1). So far as liability is concerned, an owner or operator of a vessel is liable to the United States for actual costs incurred for the removal of oil discharged in violation of § 1161 (b)(2) in an amount "not to exceed $100 per gross ton of such vessel or $14,000,000, whichever is lesser," § 1161 (f)(1), except for discharges caused solely by an act of God, act of war, negligence of the United States, or act or omission of another party. With like exceptions the owner or operator of an onshore or offshore facility is liable to the United States for the actual costs incurred by the United States in an amount not to exceed $8,000,000. § 1161 (f)(2)–(3). But in each case the owner or operator is liable to the United States for the full amount of the costs where the United States can show that the discharge of oil was "the result of willful negligence or willful misconduct within the privity and knowledge of the owner." Comparable provisions of liability spell out the obligations of "a third party" to the United States for its actual costs incurred in the removal of the oil. § 1161 (g).

So far as vessels are concerned the federal Limited Liability Act, 46 U. S. C. §§ 181–189, extends to damages caused by oil spills even where the injury is to the shore. *Richardson* v. *Harmon*, 222 U. S. 96, 106. That Act limits the liabilities of the owners of vessels to the "value of such vessels and freight pending." 46 U. S. C. § 189.

Section 12 of the Florida Act makes all licensees [3] of

[3] Those required to obtain a license are those who operate a terminal facility. § 6 (1). But licenses to terminal facilities include

terminal facilities "liable to the state for all costs of cleanup or other damage incurred by the state and for damages resulting from injury to others," it not being necessary for the State to plead or prove negligence.[4] There is no conflict between § 12 of the Florida Act and § 1161 of the Federal Act when it comes to damages to property interests, for the Federal Act reaches only costs of cleaning up. As respects damages, § 14 of the Florida Act requires evidence of financial responsibility of a terminal facility or vessel—a provision which does not conflict with the Federal Act.

The Solicitor General says that while the Limited Liability Act, *so far as vessels are concerned,* would override § 12 of the Florida Act by reason of the Supremacy Clause, the Limited Liability Act has no bearing on "facilities" regulated by the Florida Act. Moreover, § 12 has not yet been construed by the Florida courts and it is susceptible of an interpretation *so far as vessels are concerned* which would be in harmony with the Federal Act. Section 12 does not *in terms* provide for unlimited liability.

Moreover, while the Federal Act determines damages measured by the cost to the United States for cleaning up oil spills, the damages specified in the Florida Act relate in part to the cost to the State of Florida in cleaning up the spillage. Those two sections are harmonious parts of an integrated whole. Section 1161 (c) (2) directs the President to prepare a National Con-

---

"vessels used to transport oil, petroleum products, their by-products, and other pollutants between the facility and vessels within state waters." § 6 (4).

[4] Section 12 also provides that the pilot or the master of any vessel or person in charge of any licensee's terminal facility who fails "to give immediate notification of a discharge to the port manager and the nearest coast guard station" may be imprisoned for not more than two years or fined not more than $10,000.

tingency Plan for the containment, dispersal, and removal of oil. The plan must provide that federal agencies "shall" act "in coordination with State and local agencies." Cooperative action with the States is also contemplated by § 1161 (e), which provides that "[i]n addition to any other action taken by a State or local government" the President may, when there is an imminent and substantial threat to the public health or welfare, direct the United States Attorney of the district in question to bring suit to abate the threat. The reason for the provision in § 1161 ($o$)(2), stating that nothing in § 1161 pre-empts any State "from imposing any requirement or liability with respect to the discharge of oil into any waters within such State," is that the scheme of the Act is one which allows—though it does not require—cooperation of the federal regime with a state regime.

If Florida wants to take the lead in cleaning up oil spillage in her waters, she can use § 12 of the Florida Act and recoup her costs from those who did the damage. Whether the amount of costs she could recover from a wrongdoer is limited to those specified in the Federal Act and whether in turn this new Federal Act removes the pre-existing limitations of liability in the Limited Liability Act are questions we need not reach here. Any opinion on them is premature. It is sufficient for this day to hold that there is room for state action in cleaning up the waters of a State and recouping, at least within federal limits, so far as vessels are concerned, her costs.

Beyond that is the potential claim under § 12 of the Florida Act for "other damage incurred by the state and for damages resulting from injury to others." The Federal Act in no way touches those areas. A State may

have public beaches ruined by oil spills. Shrimp may be destroyed, and clam, oyster, and scallop beds ruined and the livelihood of fishermen imperiled.[5] The Federal

[5] As to the damages of oil spills to ecological factors it was recently said in 10 Harv. Int'l L. J. 316, 321–323 (1969):

"Some damage to marine life is obvious in the wake of a disaster such as the one which befell the 'Torrey Canyon.' Surface feeding fishes die when they swim into floating oil, and even slight, non-fatal contact may render their flesh inedible. Shellfish, among others, are also vulnerable to oil pollution. When the tanker 'P. W. Thirtle' grounded off Newport, Rhode Island, 31,000 gallons of heavy black oil were discharged from her tanks in an effort to refloat the ship; the result of this was the virtual destruction of the entire oyster fishery of Narragansett Bay. The most serious consequences of oil pollution, however, may not be those which are immediately obvious.

"According to Dr. Erwin S. Iversen, a marine biologist:

" 'The greatest problem may be the toxic effects on the intertidal animals that serve as food for the other more important fishes. . . . I don't think the effect is merely that of killing large populations of commercial fishes. Worse than that, it interrupts the so-called food chain.'

"There have been few specific studies of the effect that oil accumulation has on this food chain. One study, conducted by Dr. Paul Galtsoff of the United States Fish and Wildlife Service, found that the diatoms on which oysters feed will not grow where there is even a slight trace of oil on the water. The effect of oil on such microscopic marine plant life may be of great importance, because it is estimated that it takes as much as ten pounds of plant matter to produce one pound of fish.

"Large scale oil pollution, such as that which occurred when the 'Torrey Canyon' ran into the Seven Stones Reef, results in huge losses of water birds. Aside from humane and aesthetic considerations, these birds play a vital role in the ecology of the seashore, a role which profoundly affects the fishing industry. The uncertainty as to the actual extent of the damage done to marine life by oil pollution makes it difficult to estimate the economic effect of such damage, but the importance of the fishing industry within the world's economy is not in doubt and is steadily increasing. Between 1958 and 1963, for example, there was a 42% rise in the world catch. Be-

Act takes no cognizance of those claims but only of costs to the Federal Government, if it does the cleaning up.

We held in *Skiriotes* v. *Florida,* 313 U. S. 69, that while Congress had regulated the size of commercial sponges taken in Florida waters, it had not dealt with any diving apparatus that might be used. Florida had such a law and was allowed to enforce it against one of its citizens. Mr. Chief Justice Hughes, speaking for the Court, said: "It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the statute so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the State." *Id.,* at 75.

Similarly, in *Manchester* v. *Massachusetts,* 139 U. S. 240, 266, we stated that if Congress fails to assume control of fisheries in a bay, "the right to control such fisheries must remain with the State which contains such bays."

Florida in her brief accurately states that no remedy under the Federal Act exists for state or private property owners damaged by a massive oil slick such as hit England and France in 1967 in the *Torrey Canyon* disaster. The *Torrey Canyon* carried 880,000 barrels

---

cause of the increasing importance of seafood protein, future damage to marine life will have progressively greater economic consequences.

"Perhaps the most noticeable damage caused by oil pollution is the fouling of recreational beaches and shorefront property. One-half million tons of oil are washed ashore each year, rendering beaches unfit for swimming and filling the air with unpleasant odors. Besides the annoyance that this causes a vacationing public seeking relief from urban life, economic loss may be considerable. It is estimated, for example, that a serious oil spill off Long Island during the summer months would cost resort and beach operators thirty million dollars. Oil spills also create navigational and fire hazards in harbors, ports and marinas." (Footnotes omitted.)

of crude oil.[6] Today not only is more oil being moved by sea each year but the tankers are much larger.

"The average tanker used during World War II had a capacity of 16,000 tons, but by 1965 that average had risen to 27,000 tons, and new tankers delivered in 1966 averaged about 76,000 tons. A Japanese company has launched a 276,000-ton tanker, and other Japanese yards have orders for tankers as large as 312,000 tons. More than sixty tankers of 150,000 tons or more are on order throughout the world, tankers of 500,000 to 800,000 tons are on the drawing boards, and those of more than one million tons are thought to be feasible. On the new 1,010 foot British tanker 'Esso Mercia' two officers have been issued bicycles to help patrol the decks of the 166,890 ton vessel.

"The size of the tanker fleet itself is growing at a rate that rivals the growth in average size of new tankers. In 1955 the world tanker fleet numbered about 2,500 vessels. By 1965 it had increased to 3,500, and in 1968 it numbered some 4,300 ships. At the present time nearly one ship out of every five in the world merchant fleet is engaged in transporting oil, and nearly the entire fleet is powered by oil." [7]

Our Coast Guard reports [8] that while in 1970 there were 3,711 oil spills in our waters, in 1971 there were 8,736. The damage to state interests already caused by oil spills, the increase in the number of oil spills, and the risk of ever-increasing damage by reason of the size of modern tankers underlie the concern of coastal States.

While the Federal Act is concerned only with actual cleanup costs incurred by the Federal Government, the

---

[6] Brief for Appellants 25.

[7] 10 Harv. Int'l L. J., at 317–318 (footnotes omitted).

[8] Polluting Incidents In and Around U. S. Waters, Calendar Year 1971, Environmental Protection, Commandant U. S. Coast Guard.

State of Florida is concerned with its own cleanup costs. Hence there need be no collision between the Federal Act and the Florida Act because, as noted, the Federal Act presupposes a coordinated effort with the States, and any federal limitation of liability runs to "vessels," not to shore "facilities." That is one of the reasons why the Congress decided that the Federal Act does not pre-empt the States from establishing either *any requirement or liability* respecting oil spills.

Moreover, since Congress dealt only with "cleanup" costs, it left the States free to impose "liability" in damages for losses suffered both by the States and by private interests. The Florida Act imposes liability without fault. So far as liability without fault for damages to state and private interests is concerned, the police power has been held adequate for that purpose. State statutes imposing absolute liability on railroads for *all* property lost through fires caused by sparks emitted from locomotive engines have been sustained. *St. Louis & San Francisco R. Co.* v. *Mathews,* 165, U. S. 1. The Federal Act, however, while restricted to cleanup costs incurred by the United States, imposes limited liability for those costs and provides certain exceptions, unless willfulness is established. Where liability is imposed by §§ 1161 (f)–(g), previously summarized, the United States may recover the full amount of the costs where the oil spillage was the result of "willful negligence or willful misconduct." If the coordinated federal plan in actual operation leaves the State of Florida to do the cleanup work, there might be financial burdens imposed greater than would have been imposed had the Federal Government done the cleanup work. But it will be time to resolve any such conflict between federal and state regimes when it arises.

Nor can we say at this point that regulations of the Florida Department of Natural Resources requiring "con-

tainment gear" pursuant to § 7 (2)(a) of the Florida Act would be *per se* invalid because the subject to be regulated requires uniform federal regulation. Cf. *Huron Cement Co.* v. *Detroit,* 362 U. S. 440. Resolution of this question, as well as the question whether such regulations will conflict with Coast Guard regulations promulgated on December 21, 1972, pursuant to § 1161 (j)(1) of the Federal Act, 37 Fed. Reg. 28250, should await a concrete dispute under applicable Florida regulations. Finally, the provision of the Florida Act requiring the licensing of terminal facilities, a traditional state concern, creates no conflict *per se* with federal legislation. Section 1171 (b)(1) of the Federal Act provides that federal permits will not be issued to terminal facility operators or owners unless the applicant first supplies a certificate from the State that his operation "will be conducted in a manner which will not violate applicable water quality standards." And Tit. I, § 102 (b), of the recently enacted Ports and Waterways Safety Act of 1972, Pub. L. 92–340, 86 Stat. 426, 33 U. S. C. § 1222 (b) (1970 ed., Supp. II), provides that the Act does not prevent "a State or political subdivision thereof from prescribing for structures only higher safety equipment requirements or safety standards than those which may be prescribed pursuant to this title."

## II

And so, in the absence of federal pre-emption and any fatal conflict between the statutory schemes, the issue comes down to whether a State constitutionally may exercise its police power respecting maritime activities concurrently with the Federal Government.

The main barriers found by the District Court to the Florida Act are *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, and its progeny. *Jensen* held that a maritime worker on a vessel in navigable waters could not constitutionally receive an award under New York's workmen's com-

pensation law, because the remedy in admiralty was exclusive. Later, in *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149, after Congress expressly allowed the States in such cases to grant a remedy, the Court held that Congress had no such power.

But those decisions have been limited by subsequent holdings of this Court. As stated by Mr. Justice Frankfurter in *Romero* v. *International Terminal Co.*, 358 U. S. 354, 373, *Jensen* and its progeny mark isolated instances where "state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system." Mr. Justice Frankfurter added, however: "But this limitation still leaves the States a wide scope. State-created liens are enforced in admiralty. State remedies for wrongful death and state statutes providing for the survival of actions, both historically absent from the relief offered by the admiralty, have been upheld when applied to maritime causes of action. Federal courts have enforced these statutes. State rules for the partition and sale of ships, state laws governing the specific performance of arbitration agreements, state laws regulating the effect of a breach of warranty under contracts of maritime insurance—all these laws and others have been accepted as rules of decision in admiralty cases, even, at times, when they conflicted with a rule of maritime law which did not require uniformity." *Id.,* at 373–374.

Moreover, in *Just* v. *Chambers*, 312 U. S. 383, we gave our approval to *The City of Norwalk*, 55 F. 98, written by Judge Addison Brown, holding that a State may modify or supplement maritime law even by creating a liability which a court of admiralty would recognize and enforce, provided the state action is not hostile "to the characteristic features of the maritime law or inconsistent with federal legislation," 312 U. S., at 388. Mr. Chief Justice Hughes after citing *Steamboat Co.* v. *Chase*, 16

Wall. 522, and *Sherlock* v. *Alling,* 93 U. S. 99, went on to hold that, while no suit for wrongful death would lie in the federal courts under general maritime law, state statutes giving damages in such cases were valid. He said, "The grounds of objection to the admiralty jurisdiction in enforcing liability for wrongful death were similar to those urged here; that is, that the Constitution presupposes a body of maritime law, that this law, as a matter of interstate and international concern, requires harmony in its administration and cannot be subject to defeat or impairment by the diverse legislation of the States, and hence that Congress alone can make any needed changes in the general rules of the maritime law. But these contentions proved unavailing and the principle was maintained that a State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, provided that the state action 'does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.' It was decided that the state legislation encountered none of these objections. The many instances in which state action had created new rights, recognized and enforced in admiralty, were set forth in *The City of Norwalk,* and reference was also made to the numerous local regulations under state authority concerning the navigation of rivers and harbors. There was the further pertinent observation that the maritime law was not a complete and perfect system and that in all maritime countries there is a considerable body of municipal law that underlies the maritime law as the basis of its administration. These views find abundant support in the history of the maritime law and in the decisions of this Court." 312 U. S., at 389–390.

Mr. Chief Justice Hughes added that our decisions as of 1941, the date of *Just* v. *Chambers,* gave broad "recognition of the authority of the States to create rights and liabilities with respect to conduct within their borders, when the state action does not run counter to federal laws or the essential features of an exclusive federal jurisdiction." *Id.,* at 391.

Historically, damages to the shore or to shore facilities were not cognizable in admiralty. See, *e. g., The Plymouth,* 3 Wall. 20; *Martin* v. *West,* 222 U. S. 191. Mr. Justice Story wrote in 1813, "In regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never (I believe) deliberately claimed to have any jurisdiction over torts, except such as are maritime torts, that is, such as are committed on the high seas, or on waters within the ebb and flow of the tide." [9]  *Thomas* v. *Lane,* 23 F. Cas. 957, 960 (No. 13,902) (CC Me.).

On June 19, 1948, Congress enacted the Admiralty Extension Act, 46 U. S. C. § 740.[10]  The Court considered the Act in *Victory Carriers, Inc.* v. *Law,* 404 U. S. 202. In that case, the Court held that the Admiralty Extension Act did not apply to a longshoreman performing loading and unloading services on the dock. The longshoreman was relegated to his remedy under the state workmen's compensation law. *Id.,* at 215. The Court said, "At least in the absence of explicit congressional authoriza-

---

[9] A statement we recently quoted with approval in *Executive Jet Aviation, Inc.* v. *City of Cleveland,* 409 U. S. 249, 253, and *Victory Carriers, Inc.* v. *Law,* 404 U. S. 202, 205.

[10] It provides in relevant part: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

tion, we shall not extend the historic boundaries of the maritime law." *Id.*, at 214.[11]

The Admiralty Extension Act has survived constitutional attack in the lower federal courts[12] and was applied without question by this Court in *Gutierrez* v. *Waterman S. S. Corp.*, 373 U. S. 206. The Court recognized in *Victory Carriers,* however, that the Act may "intrude on an area that has heretofore been reserved for state law." *Id.*, at 212. It cautioned that under these circumstances, "we should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts." *Ibid.* While Congress has extended admiralty jurisdiction beyond the boundaries contemplated by the Framers, it hardly follows from the constitutionality of that extension that we must sanctify the federal courts with exclusive jurisdiction to the exclusion of powers traditionally within the competence of the States. One can read the history of the Admiralty Extension Act without finding any clear indication that Congress intended that sea-to-shore injuries be exclusively triable in the federal courts.[13]

Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law. Thus in *Kelly* v. *Washington,* 302 U. S. 1, it appeared that, while Congress had provided a comprehensive system of inspection of vessels on navigable

---

[11] The Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.*, recently was amended to cover employees working on shoreside areas customarily used by an employer in loading, unloading, repairing, or building a vessel. Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub. L. 92–576, § 2, 86 Stat. 1251.

[12] See *Victory Carriers, supra,* at 209 n. 9.

[13] See H. R. Rep. No. 1523, 80th Cong., 2d Sess.; S. Rep. No. 1593, 80th Cong., 2d Sess.

waters, *id.*, at 4, the State of Washington also had a comprehensive code of inspection. Some of those state standards conflicted with the federal requirements, *id.*, at 14–15; but those provisions of the Washington law relating to safety and seaworthiness were not in conflict with the federal law. So the question was whether the absence of congressional action and the need for uniformity of regulation barred state action. Mr. Chief Justice Hughes, writing for the Court, ruled in the negative, saying:

> "A vessel which is actually unsafe and unseaworthy in the primary and commonly understood sense is not within the protection of that principle. The State may treat it as it may treat a diseased animal or unwholesome food. In such a matter, the State may protect its people without waiting for federal action providing the state action does not come into conflict with federal rules. If, however, the State goes farther and attempts to impose particular standards as to structure, design, equipment and operation which in the judgment of its authorities may be desirable but pass beyond what is plainly essential to safety and seaworthiness, the State will encounter the principle that such requirements, if imposed at all, must be through the action of Congress which can establish a uniform rule. Whether the State in a particular matter goes too far must be left to be determined when the precise question arises." *Id.*, at 15.

That decision was rendered before the Admiralty Extension Act was passed.

*Huron Cement Co.* v. *Detroit*, 362 U. S. 440, however, arose after that Act became effective. Ships cruising navigable waters and inspected and licensed under fed-

eral acts were charged with violating Detroit's Smoke Abatement Code. The company and its agents were, indeed, criminally charged with violating that Code. The Court in sustaining the state prosecution said:

> "The ordinance was enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants. Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power. In the exercise of that power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government." *Id.*, at 442.

The Court reasoned that there was room for local control since federal inspection was "limited to affording protection from the perils of maritime navigation," while the Detroit ordinance was aimed at "the elimination of air pollution to protect the health and enhance the cleanliness of the local community." *Id.*, at 445. The Court, in reviewing prior decisions, noted that a federally licensed vessel was not exempt (1) "from local pilotage laws"; (2) "local quarantine laws"; (3) "local safety inspections"; or (4) "local regulation of wharves and docks." *Id.*, at 447.

It follows, *a fortiori,* that sea-to-shore pollution—historically within the reach of the police power of the States—is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy.

As discussed above, we cannot say with certainty at this stage that the Florida Act conflicts with any federal Act. We have only the question whether the waiver

of pre-emption by Congress in § 1161 (o)(2) concerning the imposition by a State of "any requirement or liability" is valid.

It is valid unless the rule of *Jensen* and *Knickerbocker Ice* is to engulf everything that Congress chose to call "admiralty," pre-empting state action. *Jensen* and *Knickerbocker Ice* have been confined to their facts, *viz.*, to suits relating to the relationship of vessels, plying the high seas and our navigable waters, and to their crews. The fact that a whole system of liabilities was established on the basis of those two cases, led us years ago to establish the "twilight zone" where state regulation was permissible. See *Davis* v. *Department of Labor,* 317 U. S. 249, 252–253. Where there was a hearing by a federal agency and a conclusion by that agency that the case fell within the federal jurisdiction, we made its findings final. *Ibid.* Where there were no such findings, we presumed state law, in terms applicable, was constitutional. *Id.,* at 257–258. That is the way the "twilight zone" has been defined.

*Jensen* thus has vitality left. But we decline to move the *Jensen* line of cases shoreward to oust state law from situations involving shoreside injuries by ships on navigable waters. The Admiralty Extension Act does not pre-empt state law in those situations. See *Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212.

The judgment below is

*Reversed.*