CHARLOTTE FARRELL, WILLIAM LEMON, ILSE MARGO LEMON, STEVEN PRITZL, ULRIC FERDINAND, GERI-SESSON FERDINAND, DIANE LERNER CRESSELL, CLARENCE COLEMAN, GEORGE JOHNSON, GARY HRUGIC, MICHAEL LORD, VICTOR MONTENEGRO, and JANICE COTHER, Plaintiffs

v.

STATIA TERMINALS VIRGIN ISLANDS CORPORA-TION, STATIA TERMINALS, N.V., and G & B MARINE, INC., Defendants

Civil No. 1986/545

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 16, 1988

414

GERALD DENNENBERG, ESQ., St. Thomas, V.I., *for plaintiffs*

CAROL G. HURST, ESQ., St. Thomas, V.I., *for defendant, Statia Terminals Virgin Islands Corporation*

FREDERICK G. WATTS, ESQ., St. Thomas, V.I., *for defendant, G & B Marine, Inc.*

O'BRIEN, *District Judge*

## MEMORANDUM AND ORDER

Does the Virgin Islands Oil Spill Prevention and Pollution Control Act ("Act"), 12 V.I.C. § 701 et seq., impose liability without fault for private damages caused by violators of its provisions? We conclude that it does not, but that a violation of the Act's provisions may be per se negligence. We do not enter summary judgment because facts are in dispute in this case as to whether certain violations ought to be excused.[1]

## I. FACTS

For reasons still in dispute, and not pertinent here, oil leaked from the barge the "St. Thomas" on February 7, 1986, into the harbor of St. Thomas located at Charlotte Amalie in the United States Virgin Islands. At the time, the barge was carrying oil owned by the defendant, Statia Terminals, N.V. ("STNV"), and in fact, the barge was owned by STNV.[2] The oil had been consigned to the defendant, Statia Terminals Virgin Islands Corporation ("Statia") and was intended for delivery to cruise ships harbored at Charlotte Amalie by a process apparently called "bunkering." Defendant, G & B Marine, Inc. ("G & B") owned the tugboat moving the barge at the time of the oil spill. G & B was under contract with STNV.

The plaintiffs, who are either adult residents of Hassel Island, St. Thomas, or adults who reside near Hassel Island, sue for

---

[1] Plaintiffs seek a declaration that "bunkering" is an abnormally dangerous activity warranting the imposition of strict liability upon those so engaged. Citing Restatement (Second) of Torts, §§ 519–520 (1977). Our resolution forecloses the necessity of reaching that issue now, however, even if we were required to reach it today, although the question is for the Court, we would await further factual development at trial before rendering a decision.

[2] By order dated May 8, 1987, we quashed service as to STNV. Because it has yet to be served within the time prescribed by that order, the amended complaint as to it will be dismissed.

damages resulting from the oil spill based on the theories of negligence, nuisance, prima facie tort, negligence per se and strict liability. They move for partial summary judgment on the issue of strict liability and negligence per se. Statia opposes and cross-moves for summary judgment on those very same issues. G & B joins Statia in this tactic.

## II. DISCUSSION

██ As the first aspect of this case, we interpret a statute. "We presume that the legislature's intent is expressed by the ordinary, common sense meaning of the words used." Territorial Court of the Virgin Islands v. Richards, 673 F. Supp. 152 (D.V.I. 1987) (citations omitted). Additionally, in the particular context of this case, we remember that a court ought not narrow coverage of a statute short of the place the legislature intended it should extend. Marsh v. Government of the Virgin Islands, 431 F. Supp. 800 (D.V.I. 1977) (Garth, Circuit Judge sitting by designation). With these general principles in mind, we turn to the Act.

The Virgin Islands Act was passed to preserve the "coastal waters" of the Virgin Islands. 12 V.I.C. § 702.[3] To this end, it

---

[3] 12 V.I.C. § 702 provides:

(1) The Legislature finds and declares that the highest and best use of the waters and shorelines of this territory is as a source of public and private recreation.

(2) The Legislature further finds and declares that the preservation of this use is a matter of the highest urgency and priority and that such use can only be served effectively by maintaining the coastal waters, estuaries, beaches and shorelines in as close to a pristine condition as possible, taking into account multiple use accommodations necessary to provide the broadest possible promotion of public and private interests.

(3) The Legislature further finds and declares that:

(a) The transfer of pollutants between vessels, between onshore facilities and vessels and between offshore facilities and vessels within the jurisdiction of the territory and the territorial waters is a hazardous undertaking;

(b) Spills, discharges and escapes of pollutants occurring as a result of procedures involved in the transfer, storage and transportation of such products pose threats of great danger and damage to the environment of the territory, to owners and users of shore front property, to public and private recreation, to citizens of the territory and other interests deriving livelihood from marine related activities, and to the beauty of the territorial shorelines;

(c) Such hazards have frequently occurred in the past, are occurring now and present future threats of potentially catastrophic proportions, all of which · are expressly declared to be inimical to the paramount interests of the territory as herein set forth; and

416

prohibited the discharge of oil and like pollutants into the waters of these islands. 12 V.I.C. § 704.[4]

Liability is imposed under the Act as to Licensees in § 712. It provides in relevant part:

Because it is the intent of this chapter to provide the means for rapid and effective cleanup and to minimize damages, any licensee and its agents or servants, including vessels destined for or leaving a licensee's terminal facility, who permits or suffers a prohibited discharge or other polluting condition to take place within territorial boundaries shall be liable to the territory for all costs of cleanup or other damage incurred by the territory and for damages resulting from injury to others. The territory shall have an absolute maritime lien which shall attach to any vessel and its freight on behalf of the territory or any person injured, for all costs of cleanup and other damages incurred as a result of a prohibited discharge. In any suit to enforce claims of the territory under this chapter, it shall not be necessary for the territory to plead or prove

(d) Such territorial interests outweigh any economic burdens imposed by the Legislature upon those engaged in transferring pollutants and related activities.

(4) The Legislature intends by the enactment of this chapter to exercise the police power of the territory by conferring upon the Department of Conservation and Cultural Affairs power to:

(a) Deal with the hazards and threats of danger and damage posed by such transfers and related activities;

(b) Require the prompt containment and removal of pollution occasioned thereby; and

(c) Establish a fund to provide for the inspection and supervision of such activities and guarantee the prompt payment of reasonable damage claims resulting therefrom.

(5) The Legislature further finds and declares that the preservation of the public uses referred to herein is of grave public interest and concern to the territory in promoting health and providing for the public safety and that the territory's interest in such preservation outweighs any burdens of absolute liability imposed by the Legislature upon those engaged in transferring pollutants and related activities.

(6) The Legislature further declares that it is the interest of this chapter to support and complement applicable provisions of the Federal Water Quality Improvement Act of 1970, specifically those provisions relating to the national contingency plan for removal of oil and other pollutants.

[4] Section 704 states:

The discharge of oil, petroleum products or their by-products, and other pollutants into or upon any coastal waters, estuaries, tidal flats, beaches and land adjoining the seacoast of the territory are prohibited.

negligence in any form or manner on the part of the licensee or any vessel. If the territory is damaged by a discharge prohibited by this chapter it need only plead and prove the fact of the prohibited discharge or other polluting condition and that it occurred.

*    *    *

It is undisputed that the defendants are licensees for the purpose of this section.[5] However, looking to the clear language of the Act, we note that strict liability runs only in favor of the territory. The relevant language is ". . . licensed 'terminal facilities' . . . shall be liable to the *territory* for cost of cleanup or other damage incurred by the territory and for damage resulting from injury to others. In any suit to enforce claims of the *territory* under the chapter, it shall not be necessary for the *territory* to plead and prove negligence. If the *territory* is damaged by a discharge prohibited by the chapter it need only plead and prove the fact of the prohibited discharge or other polluting condition and that it occurred." 12 V.I.C. § 712 (emphasis added).

This conclusion aside, we do believe that a violation of the Act's provisions is negligence per se. Comment c of section 285 of the Restatement (Second) of Torts, § 285 points out:

> Even where a legislative enactment contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases

---

[5] Although the Act does not define licensee, see 12 V.I.C. § 703, it does require pursuant to subsection 706(6) that operators of terminal facilities shall obtain a license. 12 V.I.C. § 703(9) defines "terminal facility" as follows:

"Terminal facility" means any waterfront facility of any kind, other than vessels not owned or operated by such facility, and related appurtenances located on land, including submerged lands, or on or under the surface of any kind of water, which facility and related appurtenances are used or capable of being used for the purpose of drilling for, pumping, storing, handling, transferring, processing or refining oil or other pollutants, including, but not limited to, any such facility and related appurtenances owned or operated by a public utility or a governmental or quasi-governmental body. A vessel shall be considered a terminal facility only in the event of a ship-to-ship transfer of oil, petroleum products or their by-products and other pollutants, and only that vessel going to or coming from the place of transfer and the terminal facility.

With respect solely to application fees for licenses and annual license fees as required in this chapter, the term "terminal facility" shall not be construed to include the fuel storage tanks or other facilities of any marine service facilities of any marine service station having no more than twelve hundred gallons of pollutants in storage on the premises.

It is undisputed that Statia and G & B are licensed terminals or operators of vessels within this definition.

customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence. The same is true of municipal ordinances and administrative regulations. See § 286 and Comments.

We are to consider whether the legislative intent is:

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts, § 286. In so doing, we must also consider whether the Act's purpose is, on the other hand, exclusively:

(a) to protect the interests of the state or any subdivision of it as such, and

(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

(c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

(d) to protect a class of persons other than the one whose interests are invaded, or

(e) to protect another interest than the one invaded, or

(f) to protect against other harm than that which has resulted, or

(g) to protect against any other hazard than that from which the harm has resulted.

Restatement (Second) of Torts, § 287. Moreover, § 288B tells us that the effect of an unexcused violation of a statute that defines the standard of care, is negligence in itself; and that an unexcused violation of a statute which is not so adopted as the standard of care, may be evidence of negligence.

It is clear that the Act defines the activity of transferring pollutants as hazardous. 12 V.I.C. § 702(3) see supra note 3. It also declares that spills pose a great threat of harm to owners of shore front property. Id. The Act adamantly prohibits such discharges. 12 V.I.C. § 704.

419

Thus, the Act is not designed solely for protection of territorial interests, or merely to protect the interests of members of the public qua public. It is designed to protect against exactly this kind of incident. It is one where negligence per se principles can be applied. We deny the motions here, however, because the existence of an unexcused violation on the part of each defendant is still disputable.[6] This is because we cannot accept the transcript of the Cultural Affairs hearing as substantive evidence for purpose of summary judgment since such testimony was unsworn; but we do accept the affidavit of Immel which goes to the issue of an emergency. Of course, the plaintiffs must still establish the existence of proximate causation, and their damages.

█ In so concluding we reject the defendants' argument that maritime law precludes this resolution. In Askew v. American Watering Operation, Inc., 411 U.S. 325 (1973) where the Supreme Court upheld a Florida statute similar to the Virgin Islands Act in face of a federal pre-emption attack, it had no trouble with the fact the Florida Act spoke to claims for "damages resulting from injury to others." Id. at 332–34. Cf., Ocean Barge Transport v. Hess Oil Virgin Islands Corporation, 726 F.2d 121 (3d Cir. 1984) ("'the legal theory of strict liability in tort now so prevalently applied on land can be applied to suits in admiralty'").

## III. CONCLUSION

█ For the foregoing reasons we hold that although the Virgin Islands Oil Spill and Pollution Control Act does not provide a strict liability cause of action in favor of private parties, its unexcused violation may be negligence per se. We recognize that this may be a distinction without a difference. In any case, this matter is not ripe for final decision because facts are still in dispute as to whether the violation herein may be excused.

## ORDER

THIS MATTER is before the Court on cross-motions of the respective parties for summary judgment. Having filed an opinion

---

[6] Section 288(a) excuses a violation of an Act held to be the standard of care if:
    (a) the violation is reasonable because of the actor's incapacity;
    (b) he neither knows nor should know of the occasion for compliance;
    (c) he is unable after reasonable diligence or care to comply;
    (d) he is confronted by an emergency not due to his own misconduct;
    (e) compliance would involve a greater risk of harm to the actor or to others.

of even date herewith, and the premises considered, now therefore it is

ORDERED:

THAT the cross-motions for summary judgment are DENIED. It is further ORDERED:

THAT the plaintiffs' complaint as to Statia Terminals, N.V. is DISMISSED WITHOUT PREJUDICE.

It is further ADJUDGED:

THAT an unexcused violation of the Oil Spill Prevention Act is negligence per se.