In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-1647

DAVE ROBINSON,

*Plaintiff-Appellant,*

*v.*

ALTER BARGE LINE, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05-665—**David R. Herndon**, *Chief Judge.*

———————

ARGUED DECEMBER 7, 2007—DECIDED JANUARY 16, 2008

———————

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff was a deckhand on a barge owned by the defendant, a company that provides shipping by barge in inland waterways, mainly the Mississippi River. See "Alter Barge Line, Inc.—History," www.alterbarge.com/history.html (visited Dec. 7, 2007). On three occasions he complained to management that crew members were using illegal drugs while on duty. Shortly after the third report he was fired and brought this suit for retaliatory discharge. The district judge granted summary judgment for the defendant.

The plaintiff advances four separate grounds for relief, two under Illinois law (conceded to govern any nonfederal issues in the case) and two under admiralty law (which of course is federal). One ground is section 20 of the Illinois Whistleblower Act, 740 ILCS 174/20, which forbids an employer to "retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." Using illegal drugs would be such an "activity," but there is no evidence that the plaintiff refused to engage in it. The district judge thought "activity" could be stretched to include working with drug users or on boats on which drugs were being used, but the stretch is implausible, because neither would be an illegal activity. Nor did the plaintiff refuse to work because of the presence of drugs or drug users, or indeed for any other reason. And, critically, there is no indication that he refused to use drugs himself. That is not to say that he did use them; there is no indication of that either. The point is that he did not refuse to use them—as far as appears, he was never invited to use them. Anyway there is no indication that the defendant fired him *because* he refused to use drugs. (That would be bizarre conduct—firing an employee for refusing to use illegal drugs on the job.) And so he has no claim under the statute, as the district judge correctly concluded.

The judge held in the alternative that the Whistleblower Act is preempted, so far as its application to seamen is concerned, by the federal statute that we discuss next. We need not consider that alternative ground. But in passing it by we do not mean to approve (or for that matter disapprove) the district judge's analysis.

After the Fifth Circuit in *Donovan v. Texaco, Inc.*, 720 F.2d 825 (5th Cir. 1983), held that there is no tort of retaliatory

discharge under admiralty law, Congress passed the Seaman's Protection Act, 46 U.S.C. § 2114. So far as bears on this case, the Act forbids discharging or otherwise discriminating against a seaman because he "in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that [he] believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred." § 2114(a)(1)(A); see *Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424, 452-53 (7th Cir. 2006). The plaintiff did not report the use of illegal drugs (a use that we can assume violated "a maritime safety law or regulation prescribed under that law," though neither party bothers to say so) to the Coast Guard (conceded to be the appropriate agency to report such a violation to, though there is no indication that the plaintiff complained to any agency, federal or for that matter state) until after he was fired. Nor did he tell anyone before he was fired that he was planning to complain to a federal agency. The defendant could not have fired him *because* he was about to report the use of illegal drugs to the Coast Guard if it didn't know he had any intention of doing so. And as far as the record shows, it didn't.

We have now disposed of one of the plaintiff's state claims and one of his federal claims. His other state claim is under Illinois's common law tort of retaliatory discharge. Generally an employee who does not have an employment contract can be fired at the will of the employer, but the Illinois courts, like those of most states, Deborah A. Ballam, "Employment-at-Will: The Impending Death of a Doctrine," 37 *Am. Bus. L.J.* 653, 664-66 (2000); see *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555-56 (Tenn. 1988), have created an exception for cases in which

the employee is fired because he reported dangerous or illegal activities at work. *Metzger v. DaRosa*, 805 N.E.2d 1165 (Ill. 2004); *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493 (Ill. 1998); *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 878-80 (Ill. 1981); *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (Illinois law). That is a precise description of what happened to the plaintiff, if the allegations of his complaint are true. But the defendant persuaded the district court that the plaintiff's common law claim is preempted both by the federal statute that we have just been discussing and by admiralty law—the body of legal doctrines, most judge-made, that govern the legal rights and duties of the users of navigable waterways.

The argument for preemption by the statute is unpersuasive. Remember that the statute was enacted in response to the *Donovan* decision. Donovan had been discharged because he complained to the Coast Guard. All the statute did, besides abrogating the rule adopted in *Donovan*, was to add "about to report" to "report" (a subsequent amendment extended protection for reporting to other agencies as well, besides the Coast Guard) and to entitle the seaman to refuse (without fear of retaliation) to perform duties that he reasonably believed would inflict a serious injury on him or on others. 46 U.S.C. § 2114(a)(1)(B). These narrow provisions do not suggest an intention by Congress to occupy the entire field of retaliatory discharge of seamen; nor is there any other indication of such a purpose. It would be paradoxical if, to repair the damage that it believed had been caused by *Donovan*, Congress killed the application of all state statutory and common law doctrines of retaliatory discharge to seamen—yet that is the defendant's argument.

Of course it is *possible* that shipping interests persuaded Congress in effect to trade *Donovan* for a broad immunity from state law: seamen would have a limited federal right to sue in respect of retaliatory discharge but in exchange would give up all such rights under state law. The importance of interest groups in the legislative process must not be gainsaid, and courts must be cautious not to upset legislative compromises. But nothing in the history of the Seaman's Protection Act or in any other source of knowledge to which we have been directed suggests the swap that we have conjectured. The Senate Report describes the retaliation provision of the Act as merely a response to *Donovan*. S. Rep. No. 454, 98th Cong., 2d Sess. 12 (1984).

The defendant has a somewhat stronger argument that admiralty law as a whole, which includes statutes such as the Seaman's Protection Act and the Jones Act but also judge-made doctrines, such as maintenance and cure, and divided damages in collision cases, preempts state remedies for retaliatory discharge. The Fourth Circuit has so held, *Meaige v. Hartley Marine Corp.*, 925 F.2d 700, 702-03 (4th Cir. 1991). Other courts disagree. *Zbylut v. Harvey's Iowa Mgmt. Co.*, 361 F.3d 1094, 1095-96 (8th Cir. 2004); *Clements v. Gamblers Supply Mgmt. Co.*, 610 N.W.2d 847, 848-50 (Iowa 2000); *Baiton v. Carnival Cruise Lines, Inc.*, 661 So.2d 313, 314-15 (Fla. App. 1995). We have not spoken to the issue.

The "savings to suitors" provision of 28 U.S.C. § 1333(1) (conferring on the federal courts original jurisdiction, exclusive of the state courts, over "any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled") precludes automatic preemption of state remedies by

admiralty law, *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996); *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 337-44 (1973)—the kind of preemption one finds in the labor field. Compare *Belknap, Inc. v. Hale*, 463 U.S. 491, 499 (1983). As Justice Frankfurter pointed out in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373-74 (1959), "State-created liens are enforced in admiralty. State remedies for wrongful death and state statutes providing for the survival of actions, both historically absent from the relief offered by the admiralty, have been upheld when applied to maritime causes of action. Federal courts have enforced these statutes. State rules for the partition and sale of ships, state laws governing the specific performance of arbitration agreements, state laws regulating the effect of a breach of warranty under contracts of maritime insurance—all these laws and others have been accepted as rules of decision in admiralty cases, even, at times, when they conflicted with a rule of maritime law which did not require uniformity." All that is preempted are provisions of state law that would, if applicable to maritime disputes, undermine admiralty law.

And thus a "State may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when the state action is not *hostile* to the characteristic features of the maritime law or inconsistent with federal legislation," *Just v. Chambers*, 312 U.S. 668, 691 (1941) (emphasis added), or in other words when there is no "clear conflict" with admiralty law. *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1278 (1st Cir. 1993). Such conflicts are illustrated by cases, summarized in *Yamaha Motor Corp., U.S.A. v. Calhoun*, *supra*, 516 U.S. at 210, which hold that the "federal maritime rule validating oral contracts precluded application

of state Statute of Frauds[,] . . . admiralty's comparative negligence rule barred application of state contributory negligence rule[,] . . . [and] federal maritime rule allocating burden of proof displaced conflicting state rule." See also *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 278-80 (2d Cir. 2002); *Green v. Vermilion Corp.*, 144 F.3d 332, 338-41 (5th Cir. 1998); *Sosebee v. Rath*, 893 F.2d 54 (3d Cir. 1989); *J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 818-19 (5th Cir. 1972).

The court in *Donovan* thought that allowing a seaman to sue for retaliatory discharge would upset what it described as the delicate balance between the authority of the captain of a ship over his crew and the interest of the seamen. The court emphasized the scary history of mutiny at sea, 720 F.2d 828, which dramatized, the court thought, the danger of allowing authority to be divided between captain and crew. We have no wish to encourage mutinies on Mississippi barges, but we think that accidents due to drunken and cocaine-snorting seamen pose rather a greater risk to maritime safety in U.S. waters in the twenty-first century; and it is a risk that tort liability for firing a seaman who reports such carryings-on to his captain or to the management of the barge company is likely to reduce. Congress could not have been much impressed by the concerns of the judges in the *Donovan* case, for the Seaman's Protection Act erodes the dictatorial power of the captain over his crew.

What is true is that interstate barge companies would prefer to have a uniform rule rather than have to comply with the tort laws of each of the states through which their barges pass. But if the desire for a uniform rule were enough to preempt the application of state law to maritime activities, the "savings to suitors" provision

would be empty and the legion of state laws that have been held not preempted by maritime law (which include, besides the earlier examples we gave, forum non conveniens law, *American Dredging Co. v. Miller*, 510 U.S. 443, 446-56 (1994), water-pollution laws, *Askew v. American Waterways Operators, Inc.*, *supra*; *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 625-31 (1st Cir. 1994), and antidiscrimination laws, *Ellenwood v. Exxon Shipping Co.*, 984 F.2d 1270, 1278-81 (1st Cir. 1993)) would be inexplicable.

Nevertheless, when the state interest in regulating some aspect of maritime activity is very weak, the interest in uniformity might well override it and thus justify preempting state law. See generally *Ballard Shipping Co. v. Beach Shellfish*, *supra*, 32 F.3d at 628-29; *Brockington v. Certified Electric, Inc.*, 903 F.2d 1523, 1529-33 (11th Cir. 1990). But safety is an important state interest. Collisions between barges or between barges and bridges or other structures can be immensely destructive. A collision between a barge and a railroad bridge in Alabama in 1993 killed 47 people. Michael A. Knott, "Vessel Collision Design Codes and Experience in the United States," in *Ship Collision Analysis* 75 (Henrik Gluver & Dan Olsen eds. 1998). Another barge-bridge collision, in Oklahoma in 2002, killed 14. National Transportation Safety Board, *Ramming of the Eads Bridge by Barges in Tow of the M/V* Anne Holly *With Subsequent Ramming and Near Breakaway of the* President Casino *on the Admiral, St. Louis Harbor, Missouri, April 4, 1998* (Marine Accident Report NTSB/MAR-00/01, Washington, D.C., www.ntsb.gov/publictn/2000/ MAR0001.pdf (visited Dec. 27, 2007). See also Sonya Colberg, "I-40 Bridge Collapse Third Worst in Nation," *NewsOk.com*, June 1, 2002, http://newsok.com/article/ 868772/1147960676 (visited

Dec. 25, 2007); Sipke E. van Manen & Aksel G. Frandsen, "Ship Collision With Bridges, Review of Accidents," in *Ship Collision Analysis*, *supra*, at 8.

A state's interest in maritime safety would not cut much ice were the state trying to impose a tort principle that was contrary to established admiralty law, as by trying to substitute contributory or comparative negligence for the admiralty rule of divided damages in collision cases. But liability for retaliating for an employee's complaints about safety is unlikely to interfere with safety-related rules of admiralty law unless one takes seriously the musings in the *Donovan* opinion on mutiny, which we do not do and probably were not intended to do. So limited is the scope of the Seaman's Protection Act that unless state law is applicable few seamen will have a remedy for retaliatory discharge, cf. *Gerosa v. Savasta & Co.*, 329 F.3d 317, 328-30 (2d Cir. 2003), and the result will be to undermine maritime safety, with only a slight offsetting gain in reducing the burden on boat owners of having to familiarize themselves with liability for retaliatory discharge in the states that their vessels traverse. Subjecting them to such liability does not seem "unduly burdensome on maritime activities." *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443 (1960).

At the oral argument of the appeal, the defendant's lawyer conceded that a state law that imposed liability for discharging an employee because he had complained about racial or sexual discrimination could be invoked by a seaman; admiralty law, as held in *Ellenwood v. Exxon Shipping Co.*, *supra*, would not preempt the state law. The safety of the giant barges that ply the Mississippi River has an importance to society that is comparable to encouraging complaints about racial discrimination. The

average barge carries a load of 1500 tons (some, especially on the lower Mississippi, carry twice that load), and the average tow consists of 15 barges, for a total of 22,500 tons. Coosa-Alabama River Improvement Association, Inc., "Barges and Tugboats," www.caria.org/barges_tugboats. html (visited Dec. 7, 2007). The potential damage from such a parade of motorized hippopotamuses is enormous, and employees should be encouraged to voice their concerns about safety. This is not to suggest that everyone who files a suit alleging retaliatory discharge actually is a victim of retaliation. Many such suits are based on misunderstandings (the plaintiff can't believe there was a good reason for his having been sacked, so he imputes a bad one to the employer), and some are strategic. One effect of allowing such suits will be to raise the cost of discharging bad seamen—which might reduce maritime safety. But when evaluating a claim of conflict preemption, we assume that state law does more good than harm.

The plaintiff's other federal claim is that the defendant committed a judge-made admiralty tort by firing him for raising safety concerns. There is some case support for the existence of such a tort, *Clements v. Gamblers Supply Management Co.*, *supra*, 610 N.W.2d at 850; *Borden v. Amoco Coastwise Trading Co.*, 985 F. Supp. 692, 696-99 (S.D. Tex. 1997); *Seymore v. Lake Tahoe Cruises, Inc.*, 888 F. Supp. 1029, 1034-35 (E.D. Cal. 1995), and some opposition. *Meaige v. Hartley Marine Corp.*, *supra*, 925 F.2d at 702; *Garrie v. James L. Gray, Inc.*, 912 F.2d 808, 813 (5th Cir. 1990); *Feemster v. BJ-Titan Services Co./Titan Services, Inc.*, 873 F.2d 91, 93-94 (5th Cir. 1989). If we held that there is such a tort and that it preempts state law, this would greatly weaken the defendant's argument for uniformity, though not destroy it completely unless and until the Supreme Court con-

firmed the tort (and its preemptive effect) and thus made the law uniform across the federal circuits. Such a tort (if indeed it preempted state retaliatory discharge law) would not be entirely to the liking of plaintiffs because there is no jury in admiralty unless Congress creates a right to a jury, as it has done in the Seaman's Protection Act and the Jones Act.

Nevertheless, on balance a uniform, preemptive admiralty remedy would appear to make good sense. We hesitate to declare it in the present case, however, because the plaintiff forfeited the claim in the district court. We can relieve an appellant from a forfeiture when a pure issue of law is involved, e.g., *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391-92 (7th Cir. 2007); *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003); *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 749-50 (7th Cir. 1993), because our review of the district court's resolution of such an issue is plenary, and therefore bypassing that court has limited significance for the parties and for the formulation of legal doctrine. But we won't do so in this case because the plaintiff's argument in this court for the federal rule is perfunctory, occupying only a page in his main brief. Cf. *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

To summarize, we reject all but the plaintiff's state common law claim. If that claim were in federal court only by virtue of the supplemental jurisdiction, the district court would have discretion to relinquish jurisdiction over it because the federal claims have fallen out before trial. 28 U.S.C. § 1367. But as the parties are of diverse citizenship, that disposition is barred.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*