596 F.2d 609
 12 ERC 2035, 9 Envtl. L. Rep. 20,237
 STEUART TRANSPORTATION COMPANY, Appellant,
v.
ALLIED TOWING CORPORATION, in personam, and its TUG FALCON,
in rem, Commonwealth of Virginia (State Water
Control Board), United States of
America, Appellees,
Amoco Oil Company, and Winfred E. Sutton, Sr., Defendants.
STEUART TRANSPORTATION COMPANY, Appellee,
v.
UNITED STATES of America, Appellant,
Allied Towing Corporation, in personam, and its Tug Falcon,
in rem, Commonwealth of Virginia (State Water
Control Board), Amoco Oil Company, and
Winfred E. Sutton, Defendants.
 Nos. 77-2426, 77-2427.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 14, 1978.
Decided April 10, 1979.
 
 Robert M. Hughes, III, Philip N. Davey, Norfolk, Va. (Michael F. Leban, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., on brief), for Steuart Transp. Co.
 Morton H. Clark, Norfolk, Va. (G. William Birkhead, Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for Allied Towing Corp.
 Timothy G. Hayes, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen. of Virginia and David E. Evans, Asst. Atty. Gen., Richmond, Va., on brief), for Commonwealth of Virginia.
 Allen Van Emmerik, Atty., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., William B. Cummings, U. S. Atty., Alexandria, Va., Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., on brief), for United States of America.
 David R. Owen, President, Nicholas J. Healy, Chairman, Committee on Uniformity of United States Maritime Law on brief, for amicus curiae The Maritime Law Ass'n of the United States.
 Francis B. Burch, Atty. Gen. of Maryland, Baltimore, Md., Edward F. Lawson, Asst. Atty. Gen., State of Maryland, John B. Griffith, Asst. Atty. Gen., Dept. of Natural Resources, Annapolis, Md., Joseph E. Brennan, Atty. Gen. of Maine, Augusta, Maine, Louis J. Lefkowitz, Atty. Gen. of New York, New York City, Robert L. Shevin, Atty. Gen. of Florida, Tallahassee, Fla., Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N. C., on brief), for States of Maryland, Maine, New York, Florida and North Carolina as amici curiae.
 Before BUTZNER, WIDENER and PHILLIPS, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 Steuart Transportation Company and the United States appeal a judgment entered in the liability phase of a bifurcated trial on Steuart's petition for limitation of liability arising from an oil spill out of Steuart's tank barge STC-101. We hold that (1) Steuart cannot claim contribution from the tug that was towing the barge at the time of the accident, (2) Steuart can secure limitation of liability under the Federal Water Pollution Control Act against oil pollution removal costs claimed by the United States,[1] (3) the United States cannot recover removal costs through causes of action for nuisance, maritime tort, and violation of the Rivers and Harbors Act of 1899, (4) Steuart cannot offset its pollution containment expenses against its liability to the United States, and (5) Steuart is liable to the Commonwealth of Virginia for all pollution removal expenses claimed under the state's oil pollution control statute. We therefore affirm the judgment of the district court.
 
 
 2
 * On the afternoon of February 1, 1976, Steuart's barge, carrying a full cargo of oil, departed Yorktown, Virginia, in tow of Allied Towing Corporation's tug FALCON. The flotilla encountered falling barometric readings and small craft advisories from the National Weather Service as it proceeded up the Chesapeake Bay, but the tug did not seek haven when it passed the mouth of the Rappahannock River at 10:50 p. m. Heavy snow set in during the early morning of February 2, and the tug lost sight of the barge. When visibility improved at about 6:00 a. m., the tug observed that the barge had sunk by her stern.
 
 
 3
 The sinking released oil from the barge's cargo in a quantity stipulated to be unlawful under both federal and Virginia pollution control statutes. At Coast Guard direction, Steuart spent about $40,000 in preliminary containment operations. Spillage later appeared in areas away from the immediate scene of the accident, and the Coast Guard directed an extensive removal operation which cost the United States about $480,000 and the Commonwealth of Virginia about $41,000.
 
 
 4
 The district court found that the barge sank because she shipped water. Badly deteriorated flanges securing a ventilator cowling on the deck broke during the storm, permitting seas to fill the pump room at the stern of the vessel. Steuart's failure to remove scupper plugs from the spill rail of the cargo hatches also allowed the railing to capture sea water. The court concluded that mishandling of the scupper plugs and failure to inspect the deck fittings constituted negligence within Steuart's privity and knowledge and denied Steuart limitation under the Limitation of Liability Act (Limitation Act), 46 U.S.C. § 183(a). Dismissing Steuart's counterclaims against the tug and others, the court allowed all claims against Steuart with the exception of the United States' claim for oil pollution removal costs in excess of the prevailing liability limits imposed by the Federal Water Pollution Control Act (Pollution Act), 33 U.S.C. § 1321(f)(1).[2]
 
 
 5
 Steuart appeals on three grounds. First, although Steuart accepts denial of its limitation petition, it contends that Allied Towing should share liability for the oil spill because the tug's negligence contributed to the accident. Second, Steuart seeks to offset the containment expenses it incurred at Coast Guard direction against the pollution removal costs claimed by the United States under the Pollution Act. Third, Steuart urges us to disallow Virginia's claim for the cost of oil removal because the state statute on which the claim is based has been preempted by the federal act.
 
 
 6
 The United States appeals in an effort to preserve claims for about $360,000 in removal costs that were disallowed by the district court. The United States argues that the Pollution Act's liability limit does not apply in this case because Steuart's negligence was willful within the meaning of the statute, 33 U.S.C. s1321 (f)(1). Even if Steuart's negligence was not willful, continues the government, the United States should be allowed to recover expenses in excess of the Act's limit through other causes of action.
 
 II
 
 7
 We turn first to the question of the tug's negligence. Steuart contends that falling barometric readings and National Weather Service forecasts available to the tug captain on February 1 would have caused a reasonable mariner in the captain's position to take refuge in the Rappahannock River. Therefore, Steuart argues, the tug is partly responsible for the oil spill that occurred during the storm in the Chesapeake Bay.
 
 
 8
 The district court found that the weather predicted and actually encountered was never more severe than the conditions both tug and barge were designed to withstand. That finding is not clearly erroneous. We therefore conclude that the tug's failure to seek haven was neither negligent nor a proximate cause of the oil spill. Had the barge been seaworthy, she would not have sunk. Steuart alone is at fault for the accident.
 
 III
 
 9
 We next consider whether the United States is entitled to recover its full removal costs on the ground that Steuart was guilty of willful negligence within the meaning of the Pollution Act. Under the Limitation Act, a shipowner cannot limit its liability unless it shows that the loss was not caused by negligence within its "privity or knowledge." 46 U.S.C. § 183(a).[3] The Pollution Act, however, allows limitation against oil pollution removal costs incurred by the United States unless the government can show that the discharge was due to "willful negligence or willful misconduct within the privity and knowledge of the owner." 33 U.S.C. § 1321(f)(l). Although the element of "privity and knowledge" in each act is identical, the degree of negligence that will preclude limitation of liability differs. Thus, a negligent shipowner denied relief under the Limitation Act may nevertheless secure limitation against the United States' claim for removal costs under the Pollution Act unless its negligence or misconduct was willful.
 
 
 10
 The legislative history of the Pollution Act reenforces its plain meaning. Drawn from the Water Quality Improvement Act of 1970 (Water Act), Pub.L. 91-224, § 102, 84 Stat. 91 (formerly codified at 33 U.S.C. § 1161), the language of the liability standard represents a compromise between the Senate and the House. The House proposed an oil pollution statute with liability based on fault and an absolute limitation on recoverable removal costs. H.R. 4148, 91st Cong., 1st Sess. § 2 (1969); See H.R.Rep. No. 91-127, 91st Cong., 1st Sess. 11 (1969), Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2691, 2701-02. The Senate favored strict liability within maximum limits, subject to four defenses, and unlimited liability for negligent or willful oil discharges. S. 7, 91st Cong., 1st Sess. § 102 (1969); See S.Rep. No. 91-351, 91st Cong., 1st Sess. 17-18 (1969). The final bill embodied the Senate's strict liability proposal, but imposed unlimited liability only in cases where the government could show willful negligence or willful misconduct within the privity and knowledge of the shipowner. See H.R.Conf.Rep. No. 91-940, 91st Cong., 2d Sess. 39, Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2712, 2724; Healy and Paulsen, Marine Oil Pollution and the Water Quality Improvement Act of 1970, 1 J.Mar.L. & Com. 537, 558-61 (1970).
 
 
 11
 As we already mentioned, the district court found that Steuart's haphazard inspection practices constituted ordinary negligence within Steuart's privity and knowledge and therefore denied relief under the Limitation Act. The court concluded, however, that the negligence was not willful, and it limited the United States's oil spill removal cost claim under the Pollution Act to $100 per gross ton of the barge. Thus, the government can recover only $122,300, about 25 per cent of its total costs.[4] Pointing to the same negligent practices that led the district court to deny Steuart relief under the Limitation Act, the United States asks us to deny limitation under the Pollution Act.
 
 
 12
 The United States charges that Steuart's fault constituted willful negligence within the meaning of the Pollution Act. Although the term "willful negligence" has been called a self-contradiction, it has a recognized meaning. The term refers to reckless disregard for the probable consequences of a voluntary act or omission. See Billingsley v. Westrac Co.,365 F.2d 619, 621-23 (8th Cir. 1966); F. W. Myers & Co. v. United States,360 F.Supp. 429, 434-35 (Cust.Ct.1973); cf. In re Tug Ocean Prince, Inc.,584 F.2d 1151, 1162-63 (2d Cir. 1978) (defining "willful misconduct"). Whether the negligence proved in a particular case was aggravated is a question for the fact finder to decide in light of all of the evidence. See Craven v. Southern Railway, 412 F.2d 835 (4th Cir. 1969).
 
 
 13
 Ample evidence supports the district court's conclusion that Steuart was not guilty of willful negligence. Although Steuart's inspection practices were inadequate, the barge was routinely maintained and regularly certified by the Coast Guard. She underwent annual repairs and overhauling from 1971 through 1976. Indeed, she passed a scheduled Coast Guard inspection less than two months before the oil spill in this case. The United States adduced no evidence that Steuart recklessly disregarded her unseaworthiness. Thus, the district court properly allowed limitation against the government's claim for removal costs under the Pollution Act, restricting recovery to approximately 25% Of the government's total expenses.
 
 IV
 
 14
 Denied full recovery under the Pollution Act, the government alleges that Steuart also is liable for nuisance, maritime tort, and violation of § 13 of the Rivers and Harbors Act of 1899 (Refuse Act), 33 U.S.C. § 407.[5] Since the district court denied Steuart relief under the Limitation Act, Steuart's potential liability under any one of these causes of action would be unlimited, and the government could recover the balance of its oil removal costs. Therefore, the issue is whether the Pollution Act affords the government its exclusive remedy for the recovery of these costs or whether the Act simply supplements the other remedies on which the government relies.
 
 
 15
 The United States argues that the Pollution Act neither repealed the Refuse Act nor superseded remedies for nuisance and maritime tort. Because Congress knew that unlimited recoveries were available without resort of the Pollution Act, the government reasons, the imposition of a ceiling on federal claims for removal costs would have been contrary to the declared policy of preventing all discharges of oil into navigable waters. See 33 U.S.C. § 1321(b)(1). The government asserts that the Pollution Act supplements existing causes of action by requiring evidence of a shipowner's financial ability to pay federal claims within the Act's per ton and gross limitations. Thus, continues the government, the limitations refer only to the minimum recovery guaranteed to the United States by a vessel's insurers, and traditional causes of action remain available for recovering the remaining costs of a cleanup directly from the shipowner. In short, the government contends, Congress meant to deter negligent shipowners by imposing on them the entire cost of oil pollution; it did not intend to subsidize them by paying any of the cost from taxes.
 
 
 16
 Steuart argues that both the text and the legislative history establish that the Pollution Act was intended to provide the government's exclusive remedy for recovery of oil removal costs. Steuart maintains that Congress chose to forgo the possibility of unlimited recoveries under existing law in return for the assurance of limited recoveries provided by the Act.
 
 
 17
 The district courts have reached different conclusions on this issue. Two cases in addition to the one on appeal have held that the Pollution Act is exclusive. In re Oswego Barge Corp., No. 76-CV-269 (N.D.N.Y., Nov. 13, 1978); United States v. Dixie Carriers, Inc., 462 F.Supp. 1126 (E.D.La., 1978). Another case, however, held that the Pollution Act is not exclusive and allowed the government to claim removal costs in actions for maritime tort and violation of the Refuse Act. United States v. M/V Big Sam, 454 F.Supp. 1144 (E.D.La.1978).
 
 
 18
 * The Pollution Act's specific references to existing law do not resolve the controversy over the Act's effect on earlier remedies for the recovery of pollution removal costs. The matter at first appears to be settled by the clause in 33 U.S.C. § 1321(f)(1) declaring that a shipowner shall be liable for removal costs under this section "notwithstanding any other provision of law."[6] That clause, however, bears different interpretations. If "any other provision of law" refers to laws imposing liability on an owner whose vessel discharges oil, § 1321(f)(1) seems to be the government's exclusive remedy. See In re Tug Ocean Prince, Inc., 584 F.2d 1151, 1162 (2d Cir. 1978) (dictum); In re Oswego Barge Corp., No. 76-CV-269, slip op. at 5-6 (N.D.N.Y., Nov. 13, 1978) (by implication); 3 Benedict on Admiralty § 112 at 9-13 to 9-14 (7th ed. 1975). An equally plausible construction, however, suggests that the phrase "any other provision of law" refers to laws limiting liability. See United States v. Dixie Carriers, Inc., 462 F.Supp. at 1128 (E.D.La.1975); Gilmore & Black, The Law of Admiralty 828 (2d ed. 1975). Indeed, this construction finds support in a sentence from the legislative history which says that § 1321(f)(1)'s "limitation on liability is intended to be the only limitation on liability for discharge of oil or matter under this section, notwithstanding any other provisions of law." H.R.Rep. No. 91-127, 91st Cong., 1st Sess. 11 (1969), Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2691, 2702. The cryptic reference in the legislative history, of course, does not prohibit an interpretation of the phrase as referring to both liability and limitation laws. United States v. Dixie Carriers, Inc., 462 F.Supp. at 1128 (E.D.La.1978). In sum, the "any other provision of law" clause in § 1321(f)(1) does not resolve the controversy over the exclusivity of the remedy that the statute provides.
 
 
 19
 The saving provisions of the Pollution Act provide little guidance. The most specific of these is § 1321(O )(1), which preserves prior remedies for damages to public and private property that result from an oil spill or from removal operations.[7] These property damages are distinct from the removal cost recoveries specifically provided by § 1321(f)(1). Section 1321(f)(1) deals with the government's claims for all costs incurred under § 1321(c) in responding to an illegal oil discharge.[8] Section 1321(c), in turn, mandates government action whenever oil pollution threatens the navigable waters, the seaward interests, the shorelines, or the natural resources of the United States.[9] Therefore, the saving provision in § 1321(O )(1) apparently was not intended to preserve additional remedies for the type of removal expenses addressed in § 1321(f)(1). Accord, In re Oswego Barge Corp., No. 76-CV-269 (N.D.N.Y., Nov. 13, 1978) (by implication); United States v. Dixie Carriers, Inc., 462 F.Supp. at 1129 (E.D.La.1978). Contra, United States v. M/V Big Sam, 454 F.Supp. 1144 (E.D.La.1978).
 
 
 20
 The general saving provisions in 33 U.S.C. § 1371(a) furnish little additional help.[10] Subsection (1) preserves the authority of every federal officer and agency under laws and regulations "not inconsistent" with the Pollution Act. This provision simply defines the issue. It does not indicate whether the government's authority to claim removal costs in actions for maritime tort and violation of the Refuse Act is consistent with the provisions of 33 U.S.C. § 1321.[11]
 
 
 21
 Section 1371(a)(2) declares that the Pollution Act shall not impair the authority of the Secretary of the Army under the Rivers and Harbors Act of 1899, § 13 of which is the Refuse Act.[12] This provision refers to the Secretary's remaining authority over pollution permits and obstructions to navigation. Before 1972, the Secretary administered a regime that prohibited the discharge of pollutants into navigable waters without a permit from the Army Corps of Engineers. See United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); Exec. Order No. 11574, 3 C.F.R. 986 (1970). See generally H. Lieber, Federalism and Clean Waters 23-25 (1975). In a sharp departure from past practices, the 1972 Pollution Act corrected deficiencies in the permit system with a comprehensive revision of the national water pollution control program. See EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 203, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). Authority over most permits was transferred from the Corps of Engineers to the Federal Water Pollution Control Agency. 33 U.S.C. §§ 1342(a)(5), (k), 1344. A saving clause preserved pending Refuse Act enforcement actions, Pub.L. 92-500, § 4, 86 Stat. 862, 896, but the Corps' remaining authority to enforce the Refuse Act deals with the regulation of potential obstructions to navigation.[13] See Reserve Mining Co. v. EPA, 514 F.2d 492, 530-31 (8th Cir. 1975), Modified on other grounds, 529 F.2d 181 (8th Cir. 1976); United States v. Rohm & Haas Co., 500 F.2d 167, 170-74 (5th Cir. 1974); 1 F. Grad, Treatise on Environmental Law § 3.03(1)(b) at 3-73 to 3-77, § 3.03(11) at 3-175 (1978).
 
 B
 
 22
 Having examined the Pollution Act's specific textual references to existing law, we now turn to the legislative history of the critical liability and limitation provisions in § 1321(f)(1). That history weighs against the government's claim for the preservation of past remedies for federal oil pollution removal costs. Before enacting the precursor of § 1321(f)(1) as part of the Water Act, Congress considered every aspect of the oil spill problem. It found that earlier oil pollution legislation was seriously inadequate. See H.R.Rep. No. 91-127, 91st Cong., 1st Sess. 2 (1969), Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2691, 2692; 1 F. Grad, Treatise on Environmental Law § 3.03(1)(b) at 3-72, § 3.03(8) at 3-156.6 to 3-158.3 (1978). The nature and extent of the liability to be imposed on polluters, however, presented many policy questions. The Senate report explains the legislative concern:
 
 
 23
 Extensive testimony was taken and subsequent extensive discussion occurred in executive session on the factors which should be considered in determining the type of liability. Among those factors were (1) the effect of too rigid a liability test on maritime commerce; (2) the availability of insurance for any specific amount or type of liability; (3) the economic impact of any specific amount of liability on the owner of the vessel, the shipper of the oil and the consumer; and (4) the impact of a burdensome liability test on the U.S. Government and the people of the United States.
 
 
 24
 S.Rep. No. 91-351, 91st Cong., 1st Sess. 5 (1969). The report also discloses that the Senate believed its proposed liability figure "would be adequate to pay the clean up cost for the largest and most disastrous of oil spills on record." S.Rep. No. 91-351 at 4-5. Although the liability and limitation provisions finally enacted represented a compromise between the Senate and the House,[14] this legislative history indicates that Congress intended recoveries within the statute's liability limit to be the maximum removal cost recoveries available to the government.[15]
 
 
 25
 Nothing in the legislative history suggests that Congress viewed the compromise limitation provision simply as a means of guaranteeing minimum cost recoveries by requiring shipowners to file evidence of their financial responsibility. Congress could have required insurance up to a fixed amount, while setting a still higher figure as the liability limit. Indeed, a rejected feature of the Senate Water Act bill made just such a proposal. See S.Rep. No. 91-351, 91st Cong., 1st Sess. 17-18 (1969). Thus, Congress meant the limitation of liability to put a ceiling on federal removal cost claims. Allowing federal removal cost recoveries beyond the Pollution Act's limitation would have economic consequences for oil carriers significantly different from those envisioned by Congress.
 
 C
 
 26
 The government emphasizes that repeal by implication is not favored, that two statutes addressing the same subject should be construed to give effect to both, and that statutes should be presumed to be consistent with established precepts of maritime law. These familiar canons of statutory construction, however, cannot prevail when Congress enacts a specific remedy that is contrary to judicially created remedies for the same wrong. See Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952); 2A & 3 C.D. Sands, Sutherland on Statutory Construction §§ 58.03, 61.03 (4th ed. 1973 & 1974). For this reason, the canons on which the government relies do not apply. We are dealing only with a narrow provision of the Pollution Act. The single issue is whether § 1321(f)(1) provides the exclusive remedy for the recovery of federal removal costs.[16] The judicially created remedies that the government invokes were inferred from the Refuse Act and the maritime law precisely because no adequate statutory remedy existed. These judicial remedies are inconsistent with the liability and limitation standards prescribed by the Pollution Act. If the government could secure unlimited cost recoveries against a shipowner guilty of neither willful negligence nor willful misconduct, the limitation found in § 1321(f)(1) would be nullified.
 
 
 27
 We therefore conclude that § 1321(f)(1) was designed to replace, rather than to supplement, the judicial remedies developed in the absence of a comprehensive statute. Since the judicial remedies are inconsistent with the statute, the statute provides the sole means for the federal government to recover oil removal costs. Consequently, the district court correctly ruled that the government could not recover additional removal costs by resorting to the Refuse Act or the general maritime law of tort and nuisance.
 
 V
 
 28
 Steuart seeks to offset the $40,000 it spent for containment operations against the amount that it owes to the United States. The company argues that 33 U.S.C. § 1321(d)[17] authorizes the government to reimburse all shipowners for the cost of their participation in cleanup efforts directed by the United States.
 
 
 29
 We conclude that § 1321(d) does not entitle Steuart to reimbursement. This subsection requires the government to coordinate all public and private efforts to remove an oil spill caused by a marine disaster. The expense of these efforts is deemed "a cost incurred by the United States Government for the purposes of (§ 1321(f))." This means that the United States can recover all costs incurred during the cleanup operation from the shipowner who is responsible for the spill, subject to the exceptions and limitations of § 1321(f)(1).[18] It does not mean that the owner of the polluting vessel can recover any costs from the government.
 
 
 30
 Section 1321(i)(1) governs a shipowner's right to recover its expenditures for the removal of oil spilled from its vessel.[19] This subsection allows a shipowner to recover costs only if it establishes that the discharge was due to one of the causes that would excuse the owner from all liability for federal removal expenses. See Tanker Hygrade No. 18, Inc. v. United States, 526 F.2d 805 (Ct.Cl.1975). Compare 33 U.S.C. § 1321(i)(1) With 33 U.S.C. § 1321(f)(1). The Senate report on this provision lucidly summarizes a shipowner's responsibility, liability, and rights:
 
 
 31
 If an oil spill occurs, the committee expects that the owner or operator will take such action as may be necessary, following notification, to immediately clean up the discharge. If the owner or operator fails to do so and the United States is required to act, then the United States is authorized to collect its cost up to the limit of liability or, if the United States is able to prove that the discharge was the result of negligence or a willful act, all costs regardless of limit of liability. If the owner or operator cleans up an oil discharge and later is able to prove that the discharge was caused solely by (a) an act of God, (b) an act of war, (c) negligence on the part of the U.S. Government, or (d) an act of a third party, he may recover reasonable cleanup costs from the United States in an action before the Court of Claims.
 
 
 32
 S.Rep. No. 91-351, 91st Cong., 1st Sess. 17-18 (1969).[20]
 
 
 33
 Since Steuart's negligence caused the oil spill, the company cannot satisfy the requirements of § 1321(i)(1). Thus, the district court properly ruled that Steuart cannot set off its cleanup expenses against the claim of the United States.VI
 
 
 34
 The district court held that Virginia could recover from Steuart the amount that the state spent in its efforts to clean up the oil spill. Virginia based its claim on a state statute that imposes liability without fault on shipowners responsible for oil pollution. At the time of the oil spill in this case, the Virginia law afforded no limitation on liability. 1973 Va. Acts ch. 417 (formerly Va.Code § 62.1-44.34:2).[21] The district court rejected Steuart's contention that its liability to the state was limited by the provisions of 33 U.S.C. § 1321(f)(1). The court also rejected Steuart's contention that Virginia could recover its cost only from the federal revolving fund established by 33 U.S.C. § 1321(k).
 
 
 35
 Steuart urges us to hold that Congress intended the Pollution Act to preempt state statutes that allow removal cost recoveries in excess of the Act's limitation on liability. It also contends that the Virginia statute and the federal act are in conflict. Therefore, Steuart concludes, the supremacy clause requires us to deny effect to the Virginia law.
 
 
 36
 Steuart's argument raises an issue explicitly left unresolved by the Supreme Court in Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). Askew held that the Pollution Act does not prevent the enforcement of a state statute imposing liability without fault for oil removal costs incurred by the state. The court reserved judgment, however, on "(w)hether the amount of costs (a state) could recover from a wrongdoer is limited to those specified in the Federal Act . . . ." 411 U.S. at 332, 93 S.Ct. at 1595.[22]
 
 
 37
 Federal legislation does not supersede a state statute based on the police powers unless Congress has manifested a clear intention to preempt the field or the state statute actually conflicts with the federal law. Ray v. Atlantic Richfield Co., 435 U.S. 151, 157-58, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Applying those principles to the problem in this case, we conclude that the Pollution Act does not prevent us from giving full effect to the Virginia oil pollution statute. Accord, Portland Pipe Line Corp. v. Environmental Improvement Commission, 307 A.2d 1, 44-45 (Me.), Appeal dismissed for want of substantial federal question, 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326 (1973).
 
 
 38
 In 33 U.S.C. § 1321(O )(2), Congress expressly disclaimed any intention to preempt the states "from imposing any requirement or liability with respect to the discharge of oil." Congress recognized the states' primary responsibility to eliminate pollution, and it directed the President to prepare a national contingency plan for the removal of oil spills that would coordinate the efforts of federal and state agencies. 33 U.S.C. §§ 1251(b), 1321(c)(2); See Askew, 411 U.S. 325, 329-37, 93 S.Ct. 590, 36 L.Ed.2d 280. Having acknowledged the importance of state efforts in this area, Congress did not hobble the states by subjecting their claims for removal costs to the limitation in the Pollution Act. The House conference report, commenting on § 1321(O )(2)'s antecedent in the Water Act, explained that a state could impose "additional requirements and penalties" for the discharge of oil into the waters of the state. H.R.Conf.Rep. No. 91-940, 91st Cong., 2d Sess. 42, Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2712, 2727.[23]
 
 
 39
 Steuart argues that the Virginia statute conflicts with the Pollution Act because Congress intended the limitation figure in § 1321(f)(1) to define a shipowner's maximum exposure to state and federal removal cost claims. Congress provided this limit on a shipowner's total exposure to claims, Steuart continues, so that owners could secure the insurance coverage required by § 1321(p). The inferences underlying this argument, however, are too attenuated to negate the clear manifestation of Congress' intention to let the states recover their cleanup costs without regard to the limitation imposed on the federal government. Furthermore, because liability for the federal claim remains insurable, the prospect of state claims in excess of the federal limitation does not impede the operation of the Pollution Act.
 
 
 40
 Steuart also contends that § 1321(c)(2)(H) makes the revolving fund established by § 1321(k) Virginia's sole source of reimbursement for cleanup expenses.[24] Subsection (c)(2)(H), however, simply directs the President to incorporate into his oil pollution contingency plan a procedure through which the states can be reimbursed for their removal costs from the revolving fund. It does not restrict a state's right to recover costs directly from the shipowner whose vessel discharged oil. Therefore, Virginia's remedy under its oil pollution statute is fully consistent with the state's option to seek reimbursement from the federal government under the Pollution Act.
 
 
 41
 Affirmed.
 
 
 
 [1]
 As used in the Federal Water Pollution Control Act, the words "remove" or "removal" refer to
 removal of . . . oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches (.)
 33 U.S.C. § 1321(a)(8). In this opinion, we sometimes use the word "cleanup" to refer to the same activities.
 
 
 [2]
 The district court's opinion is reported at 435 F.Supp. 798 (E.D.Va.1977)
 
 
 [3]
 Once a shipowner shows that a loss caused by its vessel was not due to negligence within the owner's privity or knowledge, the Limitation Act limits the owner's liability for the loss to the value of the owner's interest in the vessel and her pending freight
 
 
 [4]
 The Federal Water Pollution Control Act sets a shipowner's maximum liability for oil spill removal costs incurred by the United States at a figure computed with reference to the gross tonnage of the vessel causing the pollution. The limitation in force at the time of the oil spill in this case was the lesser of $100 per gross ton or $14,000,000. Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92-500, § 2, 86 Stat. 862, 866. A 1977 amendment to the law increases a barge owner's potential liability to the greater of $125 per gross ton or $125,000. Clean Water Act of 1977, Pub.L. 95-217, § 58(d)(2), 91 Stat. 1566, 1595 (codified at 33 U.S.C. § 1321(f)(1))
 
 
 [5]
 The Rivers and Harbors Act of 1899 was enacted to provide penalties for creating obstructions or nuisances in the navigable waters of the United States. See United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 663-66, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). Section 13 of the Act is often denominated the Refuse Act, although some commentators use that term to refer to the entire statute. See 411 U.S. at 658 n. 5, 93 S.Ct. 1804
 
 
 [6]
 Section 1321(f)(1), Title 33 U.S.C., provides in part:
 Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, Notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000) whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. . . . (emphasis added)
 
 
 [7]
 Section 1321(o)(1), Title 33 U.S.C., provides:
 Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel . . . to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.
 
 
 [8]
 See note 5, Supra, for the text of 33 U.S.C. § 1321(f)(1)
 
 
 [9]
 Section 1321(c)(1), Title 33 U.S.C., provides:
 Whenever any oil or a hazardous substance is discharged, or there is a substantial threat of such discharge, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or in connection with activities under the Outer Continental Shelf Lands Act or the Deepwater Port Act of 1974, or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Fishery Conservation and Management Act of 1976) the President is authorized to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel . . . from which the discharge occurs.
 
 
 [10]
 Section 1371(a), Title 33 U.S.C., provides:
 This chapter shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter; (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899 . . . ; except that any permit issued under section 1344 of this title shall be conclusive as to the effect on water quality of any discharge resulting from any activity subject to section 403 of this title, or (3) affecting or impairing the provisions of any treaty of the United States.
 
 
 [11]
 In United States v. Ira S. Bushey & Sons, Inc., 363 F.Supp. 110, 119-20 (D.Vt.1973), Aff'd without opinion, 487 F.2d 1393 (2d Cir. 1973), the court used 33 U.S.C. § 1371 (a)(1) to support its holding that the Pollution Act does not prevent courts from awarding pollution abatement injunctions against nuisances and violations of the Refuse Act
 
 
 [12]
 The Refuse Act provides criminal penalties for the discharge of refuse (other than sewage) into the navigable waters of the United States without a permit from the Army Chief of Engineers. 33 U.S.C. § 407; See United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). In order to supplement the inadequate enforcement provisions in water pollution legislation existing during the 1960's, federal officials began to invoke the Refuse Act as a broad pollution control measure. The statutory proscription of refuse discharges was construed to prohibit oil pollution. United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). The courts also interpreted the statute as impliedly authorizing injunctions to abate pollution and damages for the cost of removal operations. See Wyandotte Transportation Co. v. United States, 389 U.S. 191, 204-05, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Republic Steel Corp., 362 U.S. 482, 491-92, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960)
 
 
 [13]
 References in the legislative history to Refuse Act penalties that have been cited by the government are fully consistent with this statutory pattern. See, e. g., 118 Cong.Rec. 33705, 33757-58, 33760 (1972), Reprinted in 1 Committee on Public Works, Ser. No. 93-1, Legislative History of the Water Pollution Control Act Amendments of 1972, at 191, 252-54, 260 (1973). See generally 1 F. Grad, Treatise on Environmental Law § 3.03(1)(b) at 3-78 (1978)
 
 
 [14]
 See H.R.Conf. Rep. No. 91-940, 91st Cong., 2d Sess. 30, 35, 39, Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2712, 2714-15, 2719-20, 2724
 
 
 [15]
 Recognizing that the limitation amount was based on inadequate knowledge about the cost of oil spill cleanup operations, Congress expressed an intention to review the figure in light of later experience. See S.Rep. No. 91-351, 91st Cong., 1st Sess. 6-7 (1969). By 1977, Congress had concluded that the "per ton limit on smaller vessels is not adequate to provide liability commensurate with the costs of cleanup which have been experienced . . . ." S.Rep.No.95-370, 95th Cong., 1st Sess. 64, Reprinted in (1977) U.S.Code Cong. & Admin.News, pp. 4326, 4389. Congress therefore raised the limitation on a barge owner's liability from the lesser of $100 per gross ton or $14,000,000 to the greater of $125 per gross ton or $125,000. Clean Water Act of 1977, Pub.L. 95-217, § 58(d)(2), 91 Stat. 1566, 1595 (codified at 33 U.S.C. § 1321(f)(1)); See note 2, Supra
 
 
 [16]
 We do not consider the effect of the Pollution Act in other areas of maritime law, See, e. g., Burgess v. M/V Tamano, 564 F.2d 964, 981-83 (1st Cir. 1977) (holding shipowner liable for cleanup of oil spill caused by ship's pilot), or its effect on Refuse Act remedies other than removal cost recoveries, See, e. g., United States v. Ira S. Bushey & Sons, Inc., 363 F.Supp. 110, 119-20 (D.Vt.1973), Aff'd without opinion, 487 F.2d 1393 (2d Cir. 1973) (awarding oil pollution abatement injunction)
 
 
 [17]
 Section 1321(d), Title 33 U.S.C., provides:
 Whenever a marine disaster in or upon the navigable waters of the United States has created a substantial threat of a pollution hazard to the public health or welfare of the United States . . . because of a discharge, or an imminent discharge, of large quantities of oil, or of a hazardous substance from a vessel the United States may (A) coordinate and direct all public and private efforts directed at the removal or elimination of such threat; and (B) summarily remove, and, if necessary, destroy such vessel by whatever means are available without regard to any provisions of law governing the employment of personnel or the expenditure of appropriated funds. Any expense incurred under this subsection . . . shall be a cost incurred by the United States Government for the purposes of subsection (f) of this section in the removal of oil or hazardous substance.
 
 
 [18]
 The government's recovery from the polluter is deposited into a revolving fund, established by 33 U.S.C. § 1321(k), from which public and private cleanup expenses are reimbursed. See 33 U.S.C. § 1321(c)(2)(H), (L )
 
 
 [19]
 Section 1321(i)(1), Title 33 U.S.C., provides:
 In any case where an owner . . . of a vessel . . . from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner . . . shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Court of Claims, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes.
 
 
 [20]
 We note that a Coast Guard proposal to allow shipowners the credit Steuart seeks was not accepted by Congress. See Bills to Amend the Oil Pollution Act: Hearings on H.R. 6495, H.R. 6609, H.R. 6794, and H.R. 7325 before the House Committee on Merchant Marine and Fisheries, Ser. No. 91-4, 91st Cong., 1st Sess. 271, 275-76 (1969) (§ 4(d) of draft submitted by Vice Admiral Paul E. Trimble)
 
 
 [21]
 The Virginia statute now limits a shipowner's liability for non-negligent oil discharges to $5,000,000. Va.Code § 62.1-44.34:2(B) (Cum.Supp.1978)
 
 
 [22]
 The Supreme Court also reserved judgment on whether the Pollution Act supersedes the liability limits in the Limitation Act. Askew v. American Waterways Operators, Inc., 411 U.S. 325, 332, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). Since Steuart has been denied relief under the Limitation Act, we need not deal with that aspect of the alleged conflict between state and federal oil pollution legislation. See In re Oswego Barge Corp., 439 F.Supp. 312, 315-20 (N.D.N.Y.1977); In re Harbor Towing Corp., 335 F.Supp. 1150 (D.Md.1971); Portland Pipe Line Corp. v. Environmental Improvement Commission, 307 A.2d 1, 45 (Me.), Appeal dismissed for want of substantial federal question, 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326 (1973)
 
 
 [23]
 The full text of the conference report on what is now 33 U.S.C. § 1321(O )(2) says:
 Paragraph (2) of subsection (o) disclaims any intention of preempting any State or political subdivision from imposing any requirement or liability with respect to the discharge of oil into waters in that State. Thus, any State would be free to provide requirements and penalties similar to those imposed by this section or additional requirements and penalties. These, however, would be separate and independent from those imposed by this section and would be enforced by the States through its courts.
 H.R.Conf.Rep. No. 91-940, 91st Cong., 2d Sess. 42, Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 2712, 2727.
 
 
 [24]
 Section 1321(c)(2)(H), Title 33 U.S.C., requires the national contingency plan for the removal of oil pollution to include
 a system whereby the State or States affected by a discharge of oil or hazardous substance may act where necessary to remove such discharge and such State or States may be reimbursed from the fund established under subsection (k) of this section for the reasonable costs incurred in such removal.