Vacated and remanded by published opinion. Judge WIDENER wrote the opinion, in which Justice POWELL and Judge WILLIAMS joined.
 

 OPINION
 

 WIDENER, Circuit Judge:
 

 Defendants C.G. Willis, Inc. and Captain Charles Kellum, appeal an order of the district court granting summary judgment in favor of plaintiffs, the Maryland Department of Natural Resources and the Potomac River Fisheries Commission, and imposing strict liability as a matter of law for damages to an oyster bar that occurred when their barge went aground in tidewater of the lower Potomac River within the State of Maryland. We hold that, as applied to any damage caused by the stranding and refloating of barge WBL 118 in this case, Md. Nat. Res.Code Ann. § 4-1118.1, is preempted by federal maritime law. The judgment of the district court is vacated and the case is remanded for further consideration as a maritime tort under federal maritime law.
 

 I
 

 On May 13, 1987, the barge WBL 118, loaded with pea gravel, with a draft of nine and one-half feet at the stern and eight and one-half feet at the bow, and pushed by the tugboat
 
 Roleta,
 
 left the Maryland Rock Fa
 
 *1222
 
 cility at Lovers Point,
 
 [1]
 
 Maryland and headed south down the Potomac River toward its final destination in Florida. Both vessels were owned and operated by C.G. Willis, Inc. and were under the command of Captain Kellum. The barge ran aground at about 10:20 a.m. approximately 200 feet west of Huggins Point lighted day marker # 2, located at the mouth of Breton Bay in the Potomac River. After the barge had been re-floated and was underway, the State determined that the barge had stranded on a natural oyster bar owned by the State of Maryland. It is uncontested that the tide was low, that both vessels were at all times within the confines of the marked channel, and that the barge stranded on that portion of the oyster bar that extended into the marked navigable channel. Kellum, admits that, at the time of the stranding, he was not actually looking at the official National Oceanic and Atmospheric Administration (NOAA) navigation chart, but says that he had consulted that chart on previous occasions, that he was familiar with the area as recorded on the chart, and that he had in fact successfully navigated the area on two previous occasions.' Kellum also testified that, shortly before grounding, he referred to the
 
 Guide for Cruising Maryland Waters
 
 (13th ed.1984-85), published by the Maryland Department of Natural Resources. Although not intended to be a reliable aid to navigation, this guide likewise showed the water depth in' the area to correspond with the NOAA chart which showed about eight feet. The Guide’s chart, indeed, is a reproduction of a U.S. chart. Kellum testified that he believed the river bottom to be soft mud in the area based on his knowledge of the NOAA chart and the Maryland
 
 Guide for Cruising Maryland Waters,
 
 and that he was unaware that he had stranded on or damaged an oyster bar until he was stopped downstream at approximately 12:05 p.m. by the Maryland state authorities. It is uncontested that the location of the oyster bar was not marked by buoy or other navigational aids, or by being marked or otherwise shown on the chart in the Maryland cruising guide or the NOAA chart. However, the plaintiffs contend that adequate notice of the location of the oyster bar is provided by Md.Code Ann. Natural Resources, § 4-1102, and Real Property § 3-102, which permit the filing of a survey document entitled
 
 Oyster Survey of 1906 to 1912,
 
 as amended in 1961, to be kept on file in the office of the clerk of the circuit court of the applicable Maryland county, in this case, St. Mary’s County. That Captain Kellum had actual notice of the oyster bar, or could have obtained the same outside the said clerk’s office, is not even claimed by the plaintiffs.
 

 After some effort, Kellum successfully re-floated the barge with the help of the rising tide, and was underway again by 11:45 a.m. During the refloating efforts, the Roleta’s two six-foot propellers churned the water, but at no time did the tug go aground. Kel-lum testified that if he had known that he had stranded on an oyster bar, he would not have persisted in the same effort to refloat the barge but would have waited for the tide to float him off so as not to cause damage to the oysters.
 

 Plaintiffs brought this action as an admiralty or maritime claim within the meaning of Fed.R.Civ.P. 9(h) and the saving-to-suitors clause of 28 U.S.C. § 1333(1). They alleged damages under the strict liability provision of Md. Nat. Res.Code Ann. § 4r-1118.1,
 
 [2]
 
 under the saving-to-suitors clause, as well as for negligence for a maritime tort. They
 
 *1223
 
 claimed damage to over 15 acres of oyster bed. Based on its finding that Md. Nat. Res.Code Ann. § 4-1118.1 imposes strict liability for damage to the natural oyster bar within the waters of the State, the district court granted the plaintiffs’ motion for summary judgment on the issue of strict liability, finding that the Maryland statute was not preempted by federal maritime law. The court then heard evidence on the issue of amount of damages only, and on December 2, 1992, entered judgment against the defendants in the amount of $76,200.00.
 

 II
 

 Defendants challenge the district court’s decision imposing strict liability for damages to the oyster bar which denied them a trial under federal maritime law because that court held that the Maryland statute was not preempted by federal law. They also contend that the evidence was insufficient to support the award of damages. There being no contest that the stranding occurred in navigable waters and that the defendants were engaged in traditional maritime activity, the case was properly brought within admiralty jurisdiction of the federal courts pursuant to 28 U.S.C. § 1333(1). We review the grant of summary judgment in favor of plaintiffs
 
 de novo,
 
 with the facts considered in the light most favorable to the non-moving party.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 III
 

 The Constitution extends the judicial power of the United States “to all Cases of admiralty and maritime Jurisdiction.” U.S. Const, art. Ill, § 2. “With admiralty jurisdiction comes the application of substantive admiralty law.”
 
 East River S.S. Corp. v. Transamerica Delaval, Inc.,
 
 476 U.S. 858, 864, 106 S.Ct. 2295, 2298-99, 90 L.Ed.2d 865 (1986).
 

 The case before us involves damage to an oyster bar that occurred when a tug engaged in the traditional maritime activity of pushing a barge caused the barge to go aground in a marked channel within the navigable tidewaters of the Potomac River. There is no question but that the action comes within admiralty jurisdiction. We next determine if the stranding of the vessel is a maritime tort for which federal maritime law provides substantive rights and remedies.
 

 A
 

 The alleged injury to Maryland’s oyster bar resulted from an occurrence unique to maritime law, the stranding of a vessel. On review of the relevant law, we find, and the parties have presented no authority to the contrary, that damage to property caused by a stranding in navigable waters is uniformly treated as a maritime tort. The remedy for such a maritime tort is in admiralty and grounded on maritime theories of negligence and damages.
 

 In
 
 White Oak Transportation Co. v. Boston, Cape Cod & New York Canal Co.,
 
 258 U.S. 341, 42 S.Ct. 338, 66 L.Ed. 649 (1922), a steamship laden with coal grounded in the Cape Cod Canal. The Canal Company filed a libel in admiralty for recovery of damages to the canal and obstruction of traffic through it, which was followed by libels by the owners of the steamer and by the owner of the coal against the Canal Company for loss of the steamer and freight. The Court applied a negligence standard and held that the owners of both the steamer and the Canal Company should have known that it was unsafe to take the vessel through the canal, that the loss of the cargo must be attributed to the joint negligence of the two, and that the admiralty rule of damages for maritime torts applied so that the damages suffered by both parties due to loss of the steamer and damages to the canal should be added together and divided equally between the two. 258 U.S. at 343, 42 S.Ct. at 339.
 

 Then, in a case involving a suit against the United States for damage to the hull of a tanker when it stranded on a sand bar outside New York Harbor, the Court again addressed the question of whether a stranding is a maritime tort subject to the maritime rule of damages, and concluded:
 

 It has long been settled that the divided damages rule applies not only in cases of collision between two vessels, but also in
 
 *1224
 
 cases like this one where a vessel partly at fault is damaged in collision or grounding because of the mutual contributing fault of a nonvessel party.
 

 United States v. Reliable Transfer Co.,
 
 421 U.S. 397, 400 n. 1, 95 S.Ct. 1708, 1710 n. 1, 44 L.Ed.2d 251 (1975), citing
 
 Atlee v. Packet Co.,
 
 88 U.S. (21 Wall.) 389, 22 L.Ed. 619 (1874) (barge struck pier in the navigable waters of the Mississippi River because of mutual fault of barge and of pier owner; admiralty rule of divided damages applied), and
 
 White Oak, supra.
 
 In changing the divided damages rule for a maritime stranding the Court held:
 

 We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.
 

 421 U.S. at 411, 95 S.Ct. at 1715-16. It is of particular significance that in
 
 White Oak
 
 the Court reversed the Court of Appeals and required the application of the maritime law of negligence as well as of divided damages.
 

 We conclude that the stranding of barge WBL 118 was a maritime tort subject to the rules of decision provided by federal maritime law, both as to liability and damages.
 

 B
 

 The maritime law that governs a traditional maritime tort such as we have before us requires findings of fault and causation as predicates to liability.
 

 Liability for collisions, allisions, and other types of marine casualties is based upon a finding of fault that contributed to the damage incurred. From earliest times, this rule has been consistently applied.
 

 Schoenbaum,
 
 Admiralty and Maritime Law
 
 444 (1987); see also, e.g.,
 
 Philadelphia, Wilmington, & Balt. R.R. v. Philadelphia & Havre de Grace Steam Towboat Co.,
 
 64 U.S. (23 How.) 209, 215-16, 16 L.Ed. 433 (1859);
 
 White Oak, supra.
 

 Since, under the ordinary principles of federal maritime law, proof of this maritime tort would have required findings of negligence and causation, that must be the rule of this case unless Congress or a valid law of the State of Maryland has intervened.
 

 While the land involved in this case is submerged under the navigable tidewaters of the Potomac River within the State of Maryland and is a part of the lands covered under the Submerged Lands Act, 43 U.S.C. §§ 1301
 
 et seq.,
 
 that statute has no effect on this case, for the legislative history states:
 

 Finally, it is the intent and purpose of this bill to establish the law for the future so that the rights and powers of the States and those holding under State authority may be preserved as they existed prior to the decision of the Supreme Court in the California case.
 
 [United States v. California,
 
 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) ].
 

 H.R.Rep. No. 1778, 80th Cong., 2d Sess.,
 
 reprinted in
 
 1953 U.S.C.C.A.N. p. 1415, 1438. No other federal statute being called to our attention, we are of opinion that Congress has not acted to change the general maritime law applicable here. So, unless the State of Maryland has acted in a way which is permissible, the case must be decided under federal maritime law as a maritime tort.
 

 IV
 

 The plaintiff’s complaint contains two counts. The first count is under the Annotated Code of Maryland Natural Resources article, § 4-1118.1, and the second is under negligence. The negligence count is neither more nor less than the allegation of a maritime tort claiming that the defendants, by negligently causing the stranding of barge WBL 118 and negligently floating barge WBL 118 following the stranding, damaged the Huggins Point oyster bar, the property of the State of Maryland.
 

 The district court proceeded under the first count under the Maryland statute. It did not consider the second count, and, of course, did not consider whether or not any
 
 *1225
 
 negligence was involved, either on the part of the captain or crew of the
 
 Roleta
 
 or the States of Maryland or Virginia.
 

 The pertinent part of the statute involved is as follows:
 

 (b) Civil Liability. — Any person who destroys, damages, or injures any oyster bar, reef, rock, or other area referred to in subsection (a) of this section is liable to the State in a civil action, as the Department considers appropriate, for the restoration of, mitigation of, or monetary damages for any destruction, damage, or injury that the person causes to resources on the natural oyster bar.
 

 Md. Nat. Res.Code Ann. § 4-1118.1(b). Section (a) provides that “a person may not destroy, damage, or injure any oyster bar.” Thus, the code section creates strict liability for damage to the oyster bar, as the State maintains.
 

 It is at once apparent that the question before us is whether the state statute so changes the maritime law of torts that it may not be enforced against the defendants.
 

 The district court held that § 4-1118.1(b) was valid under
 
 Askew v. American Waterways Operators, Inc.,
 
 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), in which the Court approved a strict liability statute of the State of Florida “for any damage incurred by the State or private persons as a result of an oil spill in the State’s territorial waters.”
 
 Askew
 
 411 U.S. at 327, 93 S.Ct. at 1593. The Federal Water Pollution Control Act also regulated oil spills and the cleanup thereof, and in § 1161(o)(2) of that statute was the provision that “ ‘[njothing in this section shall be construed as preempting any State or political subdivision thereof from imposing
 
 any requirement or liability
 
 with respect to the discharge of oil into any waters within such State.’ ” (Italics are the Court’s.) The Court considered whether or not the federal statute was in conflict with the state statute and held that it was not: “... we cannot say with certainty at this stage .that the Florida Act conflicts with any federal Act.”
 
 Askew
 
 411 U.S. at 343, 93 S.Ct. at 1601. It then stated the question which is of more immediate concern to us here:
 

 We have only the question whether the waiver of preemption by Congress in § 1161(o)(2) concerning the imposition by a State of “any requirement or liability” is valid.
 

 Askew,
 
 411 U.S. at 343-44, 93 S.Ct. at 1601. The Court then held that:
 

 It is valid unless the rule of
 
 Jensen
 
 and
 
 Knickerbocker Ice
 
 is to engulf everything that Congress chose to call “admiralty” pre-empting state action.
 
 Jensen
 
 and
 
 Knickerbocker Ice
 
 have been confined to their facts,
 
 viz.,
 
 to suits relating to the relationship of vessels, plying the high seas and our navigable waters, and to their crews.
 

 Askew,
 
 411 U.S. at 344 [93 S.Ct. at 1601]. The Court then recited that a whole system of liabilities had been established on the basis of
 
 Jensen
 
 and
 
 Knickerbocker Ice
 
 which had led years ago to establish a “twilight zone” where state regulation was permissible. The Court then continued,
 
 “Jensen
 
 thus has vitality left. But we decline to move the
 
 Jensen
 
 line of cases shoreward to oust state law from situations involving shoreside injuries by ships on navigable waters,”
 
 Askew
 
 411 U.S. at 344 [93 S.Ct. at 1601], stating that the Admiralty Extension Act does not preempt state law in such situations.
 

 We are not concerned with the Admiralty Extension Act, and this is not a twilight zone case such as the case involving a state workman’s compensation statute to which, the Court referred, but, of course, we are concerned with the holding of
 
 Askew.
 
 That case held in terms that the waiver by Congress concerning the imposition by a state of “any requirement or liability” “is valid” because
 
 Jensen
 
 and
 
 Knickerbocker Ice
 
 were confined “to suits relating to the relationship of.'vessels, plying the high seas and our navigable waters, and to their crews.”
 
 Askew,
 
 411 U.S. at 344, 93 S.Ct. at 1601.
 
 [3]
 
 Because the
 
 Roleta
 
 
 *1226
 
 and barge WBL 118 were vessels “plying the high seas and our navigable waters,”
 
 Askew
 
 does not apply to them; rather the rule of
 
 Jensen
 
 applies. The continuing validity of
 
 Jensen
 
 is demonstrated by the fact that in 1994, in
 
 American Dredging, infra,
 
 the latest case on the subject, eight of the nine justices depended on
 
 Jensen
 
 for the rule of decision. We should note in passing that our ease of
 
 Steuart Transportation Co. v. Allied Towing Corp.,
 
 596 F.2d 609 (4th Cir.1979), is consistent with our opinion here, as well as with
 
 Askew.
 
 The question in
 
 Steuart
 
 was whether or not a Virginia statute requiring cleanup costs for spills to be paid to the Commonwealth was valid. We held that it was because the federal statute permitted the same.
 

 In the case at hand, maritime tort law requires negligence for liability; the Maryland statute does not require negligence for liability. Maritime tort law requires that damages be allocated proportionally according to fault; the Maryland statute places the entire burden on the person who damages the oyster bar.
 

 In cases of
 
 in personam
 
 jurisdiction, the Supreme Court has held that a State “‘is free to adopt such remedies, and to attach to them such incidents, as it sees fit,’ so long as it does not attempt to make changes in the ‘substantive maritime law.’”
 
 Madruga v. Superior Court of California,
 
 346 U.S. 556, 561, 74 S.Ct. 298, 301, 98 L.Ed. 290 (1954) (quoting
 
 Red Cross Line v. Atlantic Fruit Co.,
 
 264 U.S. 109, 124, 44 S.Ct. 274, 277, 68 L.Ed. 582 (1924)). The latest case on the subject applying that same rule is
 
 American Dredging Co. v. Miller,
 
 — U.S. -, - -, 114 S.Ct. 981, 985-86, 127 L.Ed.2d 285 (1994). Scholars agree that “states may modify or supplement federal maritime law but that they may not flatly contradict it or deprive any person of a substantive federal right.” 1
 
 Benedict on Admiralty,
 
 Jurisdiction § 112, at 7-36 (7th rev. ed.1994). And Professor Wright states that “even though the states generally may not seek to modify the general substantive maritime law relating to actions within the ambit of the saving clause, the states retain legislative power over actions that arise within their borders, provided that the enactment does not significantly depart from the general maritime law.” 14 Wright et ah,
 
 Federal Practice and Procedure
 
 § 3672, at 443-44 (2d. ed.1985).
 

 Without going in detail into the long history of the application of the saving-to-suitors clause, we find ample authority that state law may not be applied if it conflicts with, or seeks to materially change, federal maritime law. In
 
 Chelentis v. Luckenbach Steamship Co.,
 
 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), a ease involving the injury of a sailor at sea but brought for negligence at common law, the Court held that the maritime rule of damages (wages and maintenance and cure) applied, not the more liberal common law rule, and stated;
 

 Plainly, we think, under the saving clause a right sanctioned by the maritime law may be enforced through any appropriate remedy recognized at common law; but we find nothing therein which reveals an intention to give the complaining party an election to determine whether the defendant’s liability shall be measured by common-law standards rather than those of the maritime ' law. Under the circumstances here presented, without regard to the court where he might ask relief, petitioner’s rights were those recognized by the law of the sea.
 

 247 U.S. at 384, 38 S.Ct. at 504.
 

 We will not analyze each of the Supreme Court cases dealing with state law changes which the Court has not permitted to be made to federal maritime tort law, but three of them are so nearly on point with the present case as to be persuasive, even if not actually controlling because of factual differences. They are:
 
 Garrett v. Moore-McCormack Co.,
 
 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942);
 
 Pope & Talbot, Inc. v. Hawn,
 
 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed.
 
 *1227
 
 143 (1953); and
 
 Kermarec v. Compagnie Generale Transatlantique,
 
 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).
 

 In
 
 Garrett,
 
 a seaman was injured on a vessel traveling between the United States and Europe and had spent a number of months in hospitals in Europe and the United States. He sued in á Pennsylvania state court under the Jones Act and, as well, for maintenance and cure. The defendant Moore-McCormack, for the sum of $100, had received a release from Garrett. Garrett claimed that he was under the influence of drugs taken for pain when he executed the release and that he considered the $100 a payment of wages. A Pennsylvania jury rendered its verdict in favor of Garrett for $3,000 under the Jones Act and $1,000 for maintenance and cure. The question on appeal was the validity of the release. Under Pennsylvania law, Garrett had the burden of setting aside the release by clear, precise and indubitable evidence. Under admiralty law, the burden was on Moore-McCormack to sustain the release rather than on Garrett to overcome it. The Court held that the release was a part of the substantive right and not procedural. 317 U.S. at 249, 63 S.Ct. at 252-53. It held that such admiralty rule applied not only to the action for maintenance and cure but also to-the action under the Jones Act. Because the seaman “was entitled to the benefit of the full scope,” of his rights,
 
 Garrett,
 
 317 U.S. at 249, 63 S.Ct. at 253, and had not received them because of the application of the Pennsylvania rule rather than the admiralty rule, the Court reversed the Pennsylvania Supreme Court.
 

 In
 
 Pope & Talbot,
 
 Hawn was a workman, employed by a repair company, who was making repairs to Pope & Talbot’s vessel when he slipped and fell through an uncovered hatch. The ship at the time was berthed at a pier in Pennsylvania in the navigable waters of the Delaware River. Hawn sued Pope & Talbot, claiming the vessel was unseaworthy and that Pope & Talbot had been negligent.' Pope & Talbot argued that Hawn’s contributory negligence was a defense to each claim. A jury found the ship was unseaworthy, that Pope & Talbot-had been negligent, and that Hawn’s own negligence had contributed 17-1/2% of his damages. On appeal, Pope & Talbot insisted that the finding of fact that Hawn was negligent, under Pennsylvania law, as contributory negligence, would bar all recovery. The Court held, however, that Hawn’s rights were not determined by the law of Pennsylvania. It stated:
 

 Consequently, the basis of Hawn’s action is a maritime tort, a type of action which the Constitution has placed under nationál power to control in “its substantive as well as procedural features.... ”
 

 Pope & Talbot,
 
 346 U.S. at 409, 74 S.Ct. at 205. It continued:
 

 His right of recovery for unseaworthiness and negligence is rooted in federal maritime law. Even if Hawn were seeking to enforce a state created remedy for this right, federal maritime law would be controlling. While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court.
 

 346 U.S. at 409-10, 74 S.Ct. at 205. The Court held that the federal maritime law applied in which contributory negligence did not bar recovery, only being considered as to degree. Although the accident happened in Pennsylvania, the Pennsylvania law of contributory negligence which would have barred recovery was held not to apply.
 

 In
 
 Kermarec,
 
 a visitor on board a vessel berthed in New York Harbor was injured while leaving the ship by a fall down a stairway. The Court held that the owner of the ship in navigable waters under maritime law owed to Kermarec the duty of exercising reasonable care toward him. It held that the district court’s instruction to the jury, that New York law as to a gratuitous licensee might have operated as a bar to recovery, was in error, and that the admiralty rule as to damages should have applied. Notably, it stated that prejudicial error would have occurred “if the maritime law imposed upon the shipowner a standard of care higher than” that which existed under New York law. 358 U.S. at 629, 79 S.Ct. at 409. Thus,- state law
 
 *1228
 
 is not permitted to significantly change the maritime law applicable in such cases.
 

 The inferior federal courts in numbers of cases have also refused to apply state laws to actions governed by federal maritime tort law where to do so would alter the rights and liabilities of the parties. See, e.g.,
 
 Preston v. Frantz,
 
 11 F.3d 357, 358 (2d Cir.1993) (holding that application of Connecticut wrongful-death law is precluded by general federal maritime wrongful-death law),
 
 cert. dismissed,
 
 — U.S. -, 115 S.Ct. 31, 129 L.Ed.2d 928 (1994);
 
 Wahlstrom v. Kawasaki Heavy Indus., Ltd.,
 
 4 F.3d 1084, 1087-89 (2d Cir.1993) (holding that federal maritime law, and not state law, applies to all actions for wrongful death in navigable state waters),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994);
 
 Associated Elec. Coop., Inc. v. Mid-America Transp. Co.,
 
 931 F.2d 1266, 1269 (8th Cir.1991) (federal maritime law rather than state statute applies in determining contribution rights among tort-feasors when only one settles with plaintiff);
 
 Everett v. Carnival Cruise Lines,
 
 912 F.2d 1355, 1358 (11th Cir.1990) (a case where a passenger on a cruise ship tripped and fell and sued for negligence: “The district court’s view that Florida law controlled this issue ... was incorrect. Because this is a maritime tort, federal admiralty law should control. ... [I]f the injury occurred on navigable waters, federal maritime law governs the issues in the case.”);
 
 Beard v. Norwegian Caribbean Lines,
 
 900 F.2d 71, 73 (6th Cir.1990) (“As the accident in this case occurred in navigable waters, federal maritime law [reasonable care], rather than state law[very high degree of care], governs the resolution of this controversy.”);
 
 Carey v. Bahama Cruise Lines,
 
 864 F.2d 201 (1st Cir.1988) (refusing to apply a Massachusetts 50%-eom-parative-negligence rule to a maritime tort action because to do so would vitiate an “essential and longstanding feature of substantive admiralty law,” namely that contributory negligence is no bar to recovery but only mitigates damages);
 
 Byrd v. Byrd,
 
 657 F.2d 615, 617-18 (4th Cir.1981) (refusing to apply a Virginia spousal-immunity doctrine to block a maritime tort action between husband and wife, stating that “it is the standards of maritime law which measure the rights and liabilities arising from conduct occurring on vessels on the navigable waters.”).
 

 In view of all the authorities, we are of opinion that when the Maryland statute at issue significantly changed the standard of care owed by the defendants from ordinary care, as equated with negligence, to that of strict liability without regard to fault; and when the same Maryland statute changed the rule of damages for this maritime tort from proportionate damages according to degree of fault, to that of the whole damage falling upon anyone injuring Maryland’s oyster bars, it changed the “ ‘substantive maritime law.’”
 
 Madruga,
 
 346 U.S. at 561, 74 S.Ct. at 301. It deprived the defendants of “substantial admiralty rights as defined ... by interpretative decisions of [the Supreme] Court.”
 
 Pope & Talbot,
 
 346 U.S. at 410, 74 S.Ct. at 205. It gave to the States of Maryland and Virginia “... an election to determine whether the defendant’s liability [should] be measured by common-law standards rather than those of the maritime law,” contrary to
 
 Chelentis,
 
 247 U.S. at 384, 38 S.Ct. at 503-04, and, contrary to
 
 Chelentis,
 
 it did not measure those rights as “... those recognized by the law of the sea,” 247 U.S. at 384, 38 S.Ct. at 504.
 

 We thus vacate the judgment of the district court and remand the case for further proceedings to be conducted under federal maritime law. The statute of the State of Maryland, Maryland Natural Resources Code Annotated, § 4-1118.1 as applied in this case, is preempted by federal maritime tort law.
 

 VACATED AND REMANDED WITH INSTR UCTIONS.
 

 [4]
 

 , ■
 

 . We are not convinced that the ascertainment of damages is free from intertwining with the merits, and we require a new trial on the issue of damages, cf.
 
 Great Coastal Express, Inc. v. International Brotherhood of Teamsters,
 
 511 F.2d 839, 846-48 (4th Cir.1975).
 

 [1]
 

 . The chart shows Lovers Point; the transcript says Love’s Point.
 

 [2]
 

 . Md. Nat. Res.Code Ann. § 4-1118.1 (1989) reads as follows:
 

 Destroying natural oyster bars.
 

 (a) Prohibited. — Except for normal harvesting activities, the dredging and transplanting of oyster shell or seed oysters as part of the Department's Oyster Propagation Program, or as authorized in a State wetlands license, a person may not destroy, damage, or injure any oyster bar, reef, rock, or other area located on
 

 a natural oyster bar in the Chesapeake Bay that is not a leased oyster bottom.
 

 (b) Civil liability. — Any person who destroys, damages, or injures any oyster bar, reef, rock, or other area referred to in subsection (a) of this section is liable to the State in a civil action, as the Department considers appropriate, for the restoration of, mitigation of, or monetary damages for any destruction, damage, or injury that the person causes to resources on the natural oyster bar.
 

 [3]
 

 . We have examined every Supreme Court decision citing
 
 Askew
 
 since the opinion was announced in 1973 and have discovered.no modification of the holding of that case. See
 
 International Paper Co. v. Ouellette,
 
 479 U.S. 481, 502, 107 S.Ct. 805, 817, 93 L.Ed.2d 883 (1987) (Bren nan, J., concurring in part and dissenting in part);
 
 Federal Energy Regulatory Comm'n v. Mississippi,
 
 456 U.S. 742, 789 n. 26, 102 S.Ct. 2126, 2139 n. 26, 72 L.Ed.2d 532 (1982) (O'Connor, J., concurring in the judgment in part and dissenting in part);
 
 Oil, Chem. & Atomic Workers Int’l
 
 
 *1226
 

 Union v. Mobil Oil Corp.,
 
 426 U.S. 407, 435, 96 S.Ct. 2140, 2153-54, 48 L.Ed.2d 736 (1976) (Stewart, J., dissenting);
 
 Jones v. Rath Packing Co.,
 
 430 U.S. 519, 544, 97 S.Ct. 1305, 1319, 51 L.Ed.2d 604 (1977) (Rehnquist, J., concurring in part and dissenting in part);
 
 New York State Dep’t of Social Servs. v. Dublino,
 
 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973) (Powell, J.).